**UNITED STATES of America**

v.

**Harold Clay BIRCHFIELD.**

**Crim. No. 88–234–N.**

United States District Court,
M.D. Alabama.

Feb. 9, 1989.

James Eldon Wilson, U.S. Atty., Charysse L. Alexander, Asst. U.S. Atty., Montgomery, Ala., for U.S.

James C. Martin, Jr., Montgomery, Ala. (Court-appointed), for Birchfield.

ORDER

MYRON H. THOMPSON, District Judge.

Defendant Harold Clay Birchfield, who has entered a guilty plea to the offense of escape, 18 U.S.C.A. § 751(a), is now before the court for sentencing. The issue presented to the court is whether a "departure downward" is appropriate under the

Sentencing Reform Act of 1984 as amended, 18 U.S.C.A. §§ 3551, *et seq.*, and 28 U.S.C.A. §§ 991, et seq. Based on the evidence and the governing sentencing guidelines, the court determines that a departure downward is warranted and that Birchfield should be sentenced to a term of four months incarceration.

## I. BACKGROUND

The facts of this case are simple and uncontested. On October 15, 1988, Harold Clay Birchfield was an inmate at the Maxwell Federal Prison Camp in Montgomery, Alabama. After his wife and daughter had departed from the camp at the end of the day's visiting hours, Birchfield became despondent and decided to visit again with his family, hoping to have conjugal relations with his wife before she left for their home in Georgia. Shortly after 5:00 p.m., Birchfield left the confines of the prison and jogged to the nearby motel where his wife was staying. He arrived at the motel at approximately 5:30 p.m. Coincidental with his arrival at the motel, officials at the prison camp received an anonymous phone call reporting that Birchfield was at the motel.[1] Duty officers from the prison camp proceeded to the motel where they apprehended Birchfield and returned him to the camp without incident.

Later, the superintendent of the prison camp decided to prosecute Birchfield, and Birchfield was arrested. On November 15, 1988, Birchfield pled guilty in this court to the charge of escape, 18 U.S.C.A. § 751(a).

## II. APPLICATION OF THE SENTENCING GUIDELINES

For the most part, the government and the defendant agree on the calculation of

**1.** Birchfield asserts that the call was placed by his wife.

**2.** Except for the instant offense and the offense for which he was incarcerated at the Maxwell Prison Camp, Birchfield has no prior criminal record. Given that his sentence for that conviction was for a term of incarceration greater than one year and one month, he received three points under § 4A1.1(a), *Sentencing Guidelines Manual.* An additional two points were added pursuant to § 4A1.1(d) because the instant offense, escape, necessarily has as a precondition that the defendant was under a "criminal justice sentence." Finally, one point was added under

the guideline factors. They agree that Birchfield's criminal past establishes a criminal history category of III.[2] Moreover, they agree that the base offense level for Birchfield's misconduct is 13, *see* § 2P1.1(a)(1), *Sentencing Guidelines Manual,* and that Birchfield clearly deserves a two level reduction for demonstrating affirmative acceptance of personal responsibility. *See* § 3E1.1. Where the government and Birchfield part course, however, is in determining whether the specific offense characteristic located at § 2P1.1(b)(2) is applicable in this matter.

Section 2P1.1(b)(2), if applicable, would permit the court to decrease Birchfield's base offense level by seven levels. However, this reduction is only applicable in cases where "the defendant escaped from non-secure custody and returned voluntarily within ninety-six hours." § 2P1.1(b)(2). Relying upon the definition of "returned voluntarily" found in the Commentary Application Note 2 to § 2P1.1, *Sentencing Guidelines Manual,* it becomes evident that Birchfield does not meet the literal requirements of § 2P1.1(b)(2).[3]

Thus, if the court were to act merely as an automaton and mechanically apply the guidelines, a term of incarceration of between 12 and 18 months would be in order. Chap. 5, Sentencing Table, *Sentencing Guidelines Manual.*

## III. THE ROLE OF JUDGES UNDER THE SENTENCING GUIDELINES

The court would be remiss, however, if it were merely to act in such a rigid manner

§ 4A1.1(e) because Birchfield was still in confinement at the time of his instant offense. *See* Commentary Application Note 5 to § 4A1.1, *Sentencing Guidelines Manual.* A total of six points places Birchfield in the Criminal History Category III. Chap. 5, Sentencing Table, *Sentencing Guidelines Manual.*

**3.** Application Note 2 provides that "'Returned voluntarily' includes voluntarily returning to the institution or turning one's self in to a law enforcement authority as an escapee (not in connection with an arrest or other charges)."

in this case. While it is clear that the events surrounding Birchfield's return to the Maxwell Prison Camp do not meet the literal terms of § 2P1.1(b)(2), it is equally apparent to the court that Birchfield, upon having completed his conjugal visit, would have returned of his own volition within two and one-half hours from his departure from the prison camp. The court is therefore of the opinion that it would be manifestly unfair not to take this fact into consideration.

The government has argued that this court cannot take this fact into consideration. It acknowledges that Congress has provided that courts may depart from the applicable sentencing guidelines when the court "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C.A. § 3553(b). However, the government contends that, because the Sentencing Commission created an exception with § 2P1.1(b)(2) to lessen the punishment for individuals guilty of escape, 18 U.S.C.A. § 751(a), this court must assume that the Sentencing Commission has considered all the possible permutations of circumstances concerning misconduct proscribed by § 751(a) and has chosen those circumstances most relevant.

### A.

The government overlooks a significant feature in the structure of the guidelines: their evolutionary nature. As envisioned by the Sentencing Commission, the guidelines are to go through at least two phases. In this, the initial phase, judges should view the guidelines less as determinate sentences and more as starting points in the sentencing process. Toward this end, the Commission has adopted a somewhat moderate, rather than severely limiting, departure policy by expressly announcing that sentencing judges should not assume that the Commission has adequately considered all relevant factors, except in certain limited circumstances not relevant here. In the introduction to the *Sentencing Guidelines Manual*, the Commission states:

> [I]n principle, the Commission, by specifying that it had adequately considered a particular factor, could prevent a court from using it as grounds for departure. In this initial set of guidelines, however, the Commission does not so limit the courts' departure powers. The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.... [Except for certain explicitly listed factors,] the Commission does not intend to limit the kinds of factors (whether or not mentioned anywhere else in the guidelines) that could constitute grounds for departure in an unusual case.

*Id.* at 1.6–1.7. Thus, the Commission's own statement expressly belies the government's position here.

As explained below, the Commission's approach is based on a recognition that these initial guidelines may be significantly flawed because they have not yet been sufficiently subjected to the practical experience of federal judges or otherwise been sufficiently field tested.

### B.

The sentencing guidelines represent a drastic change from prior federal sentencing practices. For nearly a century prior to the introduction of the guidelines, the federal government employed a system of indeterminate sentencing. Viewing the primary purpose of sentencing to be that of rehabilitating the offender, courts attempted to obtain as much information about the defendant in order to determine the appropriate treatment. *Williams v. New York*, 337 U.S. 241, 249–52, 69 S.Ct. 1079, 1084–85, 93 L.Ed. 1337 (1949). With the exception of certain considerations that were viewed to be unconstitutional, judges were

free, and indeed encouraged, to consider any and all available information concerning the individual criminal.[4] Of course, how judges reacted to the information presented to them varied from judge to judge.[5] This was, in part, because judges' perceptions differed with regards to the importance of various factors presented to them,[6] and, in part, because no particular fact could be said to have a direct, measurable effect on the ultimate length of sentence.[7]

In order to remedy the inequities perceived to be inherent in this method of unstructured sentencing, Congress established a Sentencing Commission to create a system of sentencing guidelines. Under this new system, Congress stated that rehabilitation of criminal offenders was no longer to be considered the primary purpose of criminal incarcerative sentencing. *See Mistretta v. United States,* —— U.S. ——, —— - ——, 109 S.Ct. 647, 648–49, 102 L.Ed.2d 714 (1989) (*citing* 28 U.S.C.A. § 994(k) and S.Rep. No. 98–225, at 38, 65, *reprinted in* 1984 U.S.Code & Cong.Admin.News 3182). In its stead, uniformity, proportionality, and certainty of punishment were to be emphasized.

One of the first questions confronting the Sentencing Commission was: What facts are relevant in determining the length of criminal sentences? Of the thousands of facts that previously went into calculating an individual sentence, the Commission had to choose a relative handful to be the relevant factors in defining sentence length. And, given that the predominate characteristic in a guidelines system is that the existence of certain facts has a determinable, measurable impact on the ultimate sentence, the selection of the material facts was of utmost importance. *Cf.* Note, *How Unreliable Factfinding Can Undermine Sentencing Guidelines,* 95 Yale L.J. 1258 (1986).

The Commission, however, recognized that its product might well be deficient for two reasons: first, because its source data were imperfect; and, second, because the guidelines had not been sufficiently field tested. To remedy these deficiencies, the Commission adopted, in the initial phase of the guidelines, a moderate, rather than severely restrictive, departure policy as somewhat of a feedback mechanism. Under this mechanism, whenever a court believes that a guideline does not reflect a fair sentence under the circumstances, the court has the opportunity—indeed, the obligation—to depart from the guidelines, along with the duty to set out in detail the reasons for its departure; the Commission will then be able to collect and

---

**4.** *United States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972) (judge's discretion is "largely unlimited either as to the kind of information he may consider, or the source from which it may come"); *United States v. Restrepo,* 832 F.2d 146, 150 (11th Cir.1987) ("'possession of the fullest information possible concerning the defendant's life and characteristics' is necessary for the sentencing judge to determine the type and extent of punishment appropriate to a particular defendant").

**5.** *See, e.g.,* M. Frankel, *Criminal Sentences: Law Without Order* 12–15 (1972).

**6.** The Senate Judiciary Committee, in considering the need for a more uniform system of sentencing, described prior sentencing practices as follows:

The absence of a comprehensive Federal sentencing law and of statutory guidance on how to select the appropriate sentencing option creates inevitable disparity in the sentences which courts impose on similarly situated defendants. This occurs in sentences handed down by judges in the same district and by judges from different districts and circuits in the Federal system. One judge may impose a relatively long prison term to rehabilitate or incapacitate the offender. Another judge, under similar circumstances, may sentence the defendant to a shorter prison term simply to punish him, or the judge may opt for the imposition of a term of probation to rehabilitate him.

S.Rep. No. 225, 98th Cong., 1st Sess. 41 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3224. *See generally id.,* at 41–46, *reprinted in* 1984 U.S.Code Cong. & Admin. News at 3224–29.

**7.** *See United States v. Needles,* 472 F.2d 652, 657–58 (2nd Cir.1973) ("The sentencing process is designed to encourage the court to take into account a broad array of factors bearing on the nature of both the crime and the defendant.... As such it does not lend itself to the procedural formality of a trial; there is no definitive set of criteria and no required weight to be allocated to each consideration ...").

use these stated reasons to modify the guidelines so as to further reduce disparity among cases involving similar offenses and similar offenders. As the Commission explained:

> The Commission has adopted this departure policy [of not limiting the factors a court can consider] for two basic reasons. First is the difficulty of foreseeing and capturing a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision. The Commission also realizes that in the initial set of guidelines it need not do so. The Commission is a permanent body, empowered by law to write and rewrite guidelines, with progressive changes, over may years. By monitoring when courts depart from the guidelines and by analyzing their stated reasons for doing so, the Commission, over time, will be able to create more accurate guidelines that specify precisely where departures should and should not be permitted.

*Sentencing Guidelines Manual,* at 1.6–1.7. *See also United States v. Correa–Vargas,* 860 F.2d 35, 40 (2nd Cir.1988) ("The Commission and the courts remain in a dynamic relationship regarding the Guidelines"). To this degree, the guidelines in their initial stage retain some measure of the broad discretion exercised by federal judges prior to their adoption. Unless federal judges are encouraged to, and do, continue to exercise this discretion where warranted by departing from guidelines and by stating in detail the reasons for their departure, the Commission will be without the empirical data needed to make the guidelines more fair.[8]

In setting forth its interpretation of the Commission's view of the role of departures in this first set of sentencing guide-lines, the court, however, does not mean to intimate that district courts have free rein to depart at will from the guidelines. Such a result would be at odds with the Congressional objectives of uniformity and certainty in sentencing. Mere dislike or distaste for the empirical conclusions of the Sentencing Commission as evidenced by the determination of a guideline sentence is not adequate grounds for departure. Indeed, in the vast majority of cases, it is unlikely that a court will have a justifiable need, given the factual circumstances of the case, to engage in a departure analysis. Only in an atypical case, or in a case where an individual's circumstances do not meet the literal form of the guidelines but are clearly consistent with the policy decisions underlying the applicable guidelines, are departures in order.

### C.

This picture of the guidelines in their initial stage is not foreign to the government. In cases where the issue was whether the court should depart upward, the government has painted a similar picture. *See United States v. Ryan,* 866 F.2d 604 (3rd Cir.1989); *United States v. Correa–Vargas,* 860 F.2d 35 (2nd Cir.1988); *United States v. Burns,* Crim. No. 88–0302, slip op. (D.D.C. Oct. 14, 1988) (available on Westlaw, 1988 WL 113811).

Although this case concerns departures below the guidelines rather than above, there is no question that the same standard should govern both. To do otherwise would, in light of the position that the government has successfully taken in other cases, result in a government-biased, double standard for departures: more restrictive when the departure is downward rather than upward.

---

**8.** Several commentators have similarly encouraged departures on the grounds that (1) the Commission had a limited amount of time to produce the guidelines and (2) the fact that the guidelines were never screened by those most knowledgeable of the criminal justice system creates a presumption that the product may be flawed in some respects. *See* D. Freed and M. Miller, *Departure Sentences Under the Sentencing Commission Guidelines: Interim Report of* the Ad Hoc Sentencing Study Group 12 (1987) ("Because of the total lack of review or field testing of the guidelines submitted to Congress, courts ought to treat the early months of guidelines implementation as a *de facto* period of testing and feedback to the Commission during which flawed guidelines are undeserving of presumptive validity"); A. Altschuler, *Departures and Plea Agreements under the Sentencing Guidelines,* 117 F.R.D. 459, 459–61 (1987).

## IV. DETERMINING THE PROPER SENTENCE

■ Having stated the standard by which the court should measure its authority to depart from guidelines, the court will now proceed with an explanation for doing so in this case. In this case, it is clear that Birchfield intended to return to the prison camp within a short period of time. His departure was motivated solely on the basis of visiting with his family a short while longer and having a conjugal visit with his wife. Had the anonymous call not been placed, Birchfield would have returned to the camp before the next count. Indeed, had the call not been placed, there is some question as to whether the authorities at Maxwell would even have known of Birchfield's absence. To be sure, it could be argued that Birchfield is making a *post hoc* suggestion in order to obtain the mercy of the court. While the court independently acknowledges that, under other circumstances, such a possibility might exist, the court is confident and so finds as a factual matter, based upon all of the circumstances including Birchfield's demeanor and credibility before this court, that this is not such a case.

The question before the court then becomes whether the significance of Birchfield's intentions is captured by the applicable guideline, § 2P1.1(a)(1). If it is, then the court should remain within the guidelines, and the relevance of this fact will determine where within the sentencing range of 12–18 months Birchfield's sentence should be. If it is not, however, then a departure sentence may be warranted.

In determining what sentence Birchfield should receive, the court is guided in great part by the fact that the Sentencing Commission included § 2P1.1(b)(2) as a specific offense characteristic reducing the base offense level for escape from a non-secure facility. Section 2P1.1(b)(2) informs judges that a reduction in sentence is warranted when a defendant who has escaped from a non-secure facility returns voluntarily within 96 hours. As the court reads this guideline, the Sentencing Commission has made an express determination that an individual who escapes and returns within a short period of time is not to be treated as severely as that individual might otherwise be treated. Because such an individual, reacting perhaps out of emotion or frustration or for other personal reasons, exercises the maturity and responsibility to admit in an expedient manner to having acted rashly and wrongfully and takes the affirmative action of surrendering to the authorities, these events should be considered mitigating factors.

In examining the factual circumstances surrounding Birchfield's offense, the court is convinced that, given the court's previous factual findings concerning Birchfield's intentions, Birchfield should be treated in a manner similar to the offender who leaves a non-secure facility and returns within 96 hours. In reaching this conclusion, the court considered three hypothetical offenders, all with identical criminal histories to Birchfield. The first, Offender A, escaped by creating a disturbance, remained at-large for six months, and was finally apprehended as a result of a massive four state search by law enforcement officials. The second, Offender B, walked away from the facility unobserved, remained at-large for two weeks, and then turned himself in to the authorities. The third, Offender C, created a disturbance to cover his escape, managed to evade law enforcement agents for three days, and finally, on the fourth day, exhausted, turned himself in to the authorities.

It appears clear to the court that the differences in the factual circumstances between Offender A and Offender B can be accounted for by giving B a sentence at the bottom of the applicable range and by giving A a sentence at the top of the applicable range. Offender C, even though his actions might have resulted in large expenditures of law enforcement agency resources for three days, would, because he was fortunate enought to evade discovery, benefit from the reduction of seven levels pursuant to § 2P1.1(b)(2).

In the court's view, the circumstances surrounding Birchfield's escape should be treated more like those of Offender C than

Offenders A and B. Indeed, given the court's factual finding that Birchfield would have returned to the prison of his own volition within two and one-half hours of his departure, Birchfield is more deserving of a lower sentence than Offender C.

Given this conclusion, the court believes that it is acting within the spirit and fulfilling the purpose of the sentencing guidelines by departing from the guidelines in this case. Nothing is to be gained by remaining bound to the linguistic terms of the guidelines; rather, the court has an independent responsibility to see that the guidelines' purposes are being furthered. Departing in this case furthers those objectives—the defendant is still being punished for his actions, yet the surrounding circumstances are taken into consideration.[9] *Cf.* 18 U.S.C.A. § 3553(a) ( "[t]he court shall impose a sentence sufficient, *but not greater than necessary,* to comply with the purposes set forth in paragraph (2) of this subsection") (emphasis added).

Moreover, by departing in this case, the court hopes to communicate to the Sentencing Commission its considered judgment that the reasons and circumstances surrounding an offender's escape from and return to incarceration are important special offender characteristics that need to be considered in determining the appropriate sentence.[10] By departing in this case with a full explanation of the reasons why the court believes a departure was not only justified but necessary, the court hopes that it can provide the Commission with important feedback regarding this initial set of guidelines. The court is confident that, by its actions and those of its colleagues on the bench, a line of communication between the Commission and the federal judiciary can be established that will, in the long run, result in a more sophisticated and refined guidelines system.

Consequently, it is the court's view that a sentence of four months is sufficient to further the objectives of the Sentencing Reform Act of 1984—namely, reflect the seriousness of the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed correctional treatment in the most effective manner. This sentence is within the guideline range that would have been applicable had Birchfield not been apprehended at the motel and instead returned of his own volition.

Finally, relying upon the same four objectives of the Sentencing Reform Act that it relied upon to determine the appropriate length of sentence, the court concludes that this sentence should run consecutively to the term of incarceration that Birchfield was serving at the Maxwell Prison Camp. *See* 18 U.S.C.A. § 3584(b). *See also* § 5G1.3. A concurrent sentence for this offense would not be appropriate from a general deterrent perspective; it would send the wrong message that the rules of the prison camp, and indeed the laws of society, can be broken without consequence. Inmates at Maxwell Prison Camp

**9.** The court does acknowledge that its decision to depart on the basis of the grounds stated, if done frequently, could create a disincentive for prison authorities to seek out escapees quickly. Instead, the authorities might decide to wait and see whether the escapee will return of his own volition. While the court has no intention of endorsing such an outcome, it also doubts whether such would ever be the case. The court also does not view this to be an issue that will arise frequently; rather, it is a result that is dictated solely by the facts of the case presently before the court.

**10.** Thus, while the court finds that Birchfield is entitled to a departure reducing his sentence, the court would view quite differently a hypothetical Offender D, who like Birchfield, was apprehended shortly after walking off the pris-

on camp's confines, but who, in marked contrast to Birchfield, initiated a disturbance in the attempt to cover his departure, and had a car parked one block from the prison awaiting his arrival, with a fake passport, a plane ticket to South America, and perhaps a gun inside. There is no question that Birchfield and Offender D, by escaping, have broken the law and should be punished. Nonetheless, the court also believes that the two should receive substantially different punishment, even though they have been apprehended at the same point in time in their escape. In other words, the court believes that the intentions and actions of the inmate upon departing the prison confines are an important consideration to be factored into the calculation of an appropriate sentence.

must understand, regardless of how relaxed their place of confinement may appear, that they are being punished for their criminal behavior.

An appropriate judgment and order of commitment shall be entered.