**UNITED STATES of America, Appellee,**

v.

**Richard SKOWRONSKI, Defendant–Appellant.**

**No. 1391, Docket 92–1002.**

United States Court of Appeals, Second Circuit.

Argued April 23, 1992.

Decided June 29, 1992.

James B. Comey, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., on the brief), for appellee.

John Nicholas Iannuzzi, New York City (Iannuzzi and Iannuzzi, on the brief), for defendant-appellant.

Before: OAKES, Chief Judge, KEARSE and WALKER, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Richard Skowronski appeals from a judgment entered in the United States District Court for the Southern District of New York following a jury trial before John M. Cannella, *Judge*, convicting him of conspiring to obstruct, delay, and affect commerce by robbery, in violation of 18 U.S.C. § 1951 (1988) ("Hobbs Act" or "Act"). He was sentenced principally to 57 months' imprisonment, to be followed by a three-year term of supervised release. On appeal, Skowronski contends chiefly (1) that the court erred in admitting certain evidence, (2) that the properly admitted evidence was insufficient to support his conviction, and (3) that the court erred in computing his sentence. For the reasons below, we affirm the judgment.

## I. BACKGROUND

The government's proof at trial consisted principally of telephone conversations intercepted by court-authorized wiretap, and testimony of Federal Bureau of Investigation ("FBI") agents who interviewed or conducted surveillance of Skowronski. The principal wiretap evidence came from the Long Island home telephone of one Lawrence Tinnirello and included recorded conversations between, *inter alios*, Tinnirello and his cousin Joseph DiSomma, who was Skowronski's closest friend, and between Tinnirello and alleged coconspirator Lawrence Taylor. Taken in the light most favorable to the government, the evidence showed the following.

In late 1989, Richard Skowronski, then a college student, worked part-time at the Telco Jewelry ("Telco") store on Avenue U in Brooklyn, New York. The store carried an inventory worth about $300,000; when closed, it was protected by security gates lowered over the door and display windows. From Thanksgiving through the end of the Christmas season, the store remained open until 9:00 p.m., and during evening business hours it was protected by security guards. The store was managed by Skowronski's mother. In addition to Skowronski and his mother, it employed three women, and the owner testified that store policy normally required that at least three employees be present at all times. Skowronski's mother, called to testify in his behalf, testified that at all times during the Christmas season there were at least four employees plus a guard in the store, and that at times the total rose to seven.

In November 1989, the wiretap on Tinnirello's telephone alerted surveillance agents to a plan by, *inter alios*, Tinnirello, DiSomma, Taylor, and Skowronski (generally referred to in the conversations as "Richie" or "the kid"), to rob the Avenue U Telco store. On November 18, Tinnirello told Taylor that "the kid" wanted them to rob his store and that the kid would "stand up." Telco also owned a jewelry store on 18th Avenue in Brooklyn, and in describing the plan to rob Telco's Avenue U store in a week or two, Tinnirello stated that he would employ the same method used recently in robbing another jewelry store on 18th Avenue "[t]hat, uh, that was next door to the other store that they own." Tinnirello said the robbers had, *inter alia*, "put the gates down," and that is what he planned.

On November 20, Tinnirello left a message on DiSomma's answering machine, saying that he "want[ed] to meet Richie this week and take a look at that thing." DiSomma returned the call the next day, and Tinnirello confirmed that he planned to go to Brooklyn. DiSomma said that "Richie" had mentioned "it" and stated that "he said whatever night, just give me a day's, a night's notice...."

On November 23, Tinnirello called one Charles Lachterman and, explaining that he would talk "very vaguely," said he was going to Brooklyn. He said, "I got an

inside guy," and "[i]t's just him and two girls, and he wants to take the whole fuckin' place.... Now my friend works in there. You understand? So it's a setup." Tinnirello said he intended to reconnoiter, to "go there and buy somethin', a chain or somethin'," in order to "see how much money is involved." On November 27, Tinnirello told DiSomma that he and Taylor would go to case the Telco store the following day, and assured DiSomma that he would alert Skowronski in advance. "I have Richie's beeper. I'm gonna beep him first," in order not to shock him, causing him to "faint"—or worse, causing him to greet Tinnirello with familiarity.

Shortly after noon on December 13, FBI agents visited Skowronski, who was then baby-sitting at his sister's home, and told him they had information that the Avenue U Telco store was to be robbed and that he was involved. The agents sought both to prevent the robbery and to encourage Skowronski to cooperate in their investigation. They did not reveal the wiretap on Tinnirello's telephone, however, implying that their information had come from one of Skowronski's coworkers. Skowronski denied any knowledge of or involvement in a robbery plan.

Soon after the agents departed, Skowronski's sister returned home. Skowronski promptly left and drove several blocks to a pay telephone, where he appeared to make a total of three calls. He then drove to his own home, which was a few blocks away. Minutes later, DiSomma arrived.

At about 1:30, Skowronski and DiSomma left in the latter's car and drove several blocks to another pay telephone, where they called Tinnirello. DiSomma opened this call by telling his cousin, "We got trouble." When Tinnirello asked what had happened, DiSomma urged him to go to a telephone booth and call back. When Tinnirello persisted in his questioning, DiSomma repeated that Tinnirello should go to a pay telephone, and Skowronski took the phone and urged him, "Now." When Tinnirello continued to resist going to a pay telephone, insisting that his home telephone was not tapped, DiSomma told him that the trouble involved Tinnirello, DiSomma, and "my friend," and answered affirmatively when Tinnirello asked, "Who, Richie?" DiSomma tried to impress on Tinnirello that the matter was "serious," and Skowronski emphasized, "Very." Tinnirello asked, "Who's that, Richie?" and DiSomma responded, "Yeah. He was paid a visit today." After Tinnirello continued to press for details of the problem, Skowronski again took the telephone and said, "Lar, go to a pay phone, dude."

About an hour after that conversation concluded, DiSomma telephoned Tinnirello again at his home, and the two pondered the source of the FBI's information and discussed the reliability of Skowronski not to inform on them. DiSomma reassured Tinnirello that Skowronski was "a stand-up kid." DiSomma also said he "d[id]n't wanna see the kid get fired," and he and Tinnirello then discussed what Telco's owner should be told about the FBI's visit to Skowronski, and what explanation would be given to "Richie's mother."

Eventually, the known participants in the plan were arrested. Skowronski, Taylor, and another were charged in a one-count indictment with conspiring to obstruct, delay, and affect commerce by robbing the Avenue U Telco store, in violation of the Hobbs Act, 18 U.S.C. § 1951. Tinnirello, Lachterman, and DiSomma were charged in a separate indictment with the same Hobbs Act conspiracy and with other offenses.

Skowronski was tried alone because both of his co-defendants died prior to trial. At his first trial, the jury was unable to agree on a verdict. At the retrial, the jury found him guilty as charged. He was sentenced as indicated above, and this appeal followed.

## II. DISCUSSION

On appeal, Skowronski contends principally that the trial court erred in admitting evidence, that the properly admitted evidence was insufficient to convict him, and that the court erred in calculating his sentence. We find no merit in his contentions.

A. *The Challenges to the Admission of Evidence*

■ Skowronski contends that the introduction of expert testimony by an FBI agent explaining some of the terms used in the taped telephone conversations was unfairly prejudicial because the testimony introduced the specter of organized crime. He also claims that evidence introduced about the other jewelry store robbery referred to by Tinnirello was improperly admitted because it was irrelevant and unduly prejudicial. These contentions need not detain us long.

■ The trial judge is accorded broad discretion under Fed.R.Evid. 702 to admit expert testimony when he believes it will assist the jury in understanding a question of fact; his decision to admit such testimony will be sustained on appeal unless it is shown to be "manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *United States v. Torres*, 901 F.2d 205, 237 (2d Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987); *United States v. Cruz*, 797 F.2d 90, 96 (2d Cir.1986).

In the present case, the court allowed the government to introduce evidence as to the meanings of terms such as "stand-up" (*i.e.*, unlikely to inform), likely to "flip" (*i.e.*, likely to inform), and "made guy" (*i.e.*, a documented and sworn member of an organized crime family). It was well within the discretion of the court to allow expert testimony as to the specialized meanings of these terms on the ground that the jury might not otherwise be familiar with them. Though Skowronski's insistence on elaboration to the jury of the witness's qualifications in this area necessitated greater airing of the witness's experience in investigating organized crime than Skowronski now feels was desirable, the record provides no basis for an inference that the government improperly introduced mention of organized crime or sought to gain any unfair advantage. We find no error in the admission of the expert testimony.

■ Skowronski's other evidentiary challenge is that the court should have excluded the government's evidence describing the robbery of a jewelry store on 18th Avenue in Brooklyn, committed shortly before Tinnirello's November 18 conversation with Taylor. His contention has no merit. The trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events involved in the case. *See, e.g., United States v. Coiro*, 922 F.2d 1008, 1015–16 (2d Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991); *United States v. Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir. 1990), *cert. denied*, — U.S. —, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991). Background evidence may be admitted, for example, to furnish an explanation of the understanding or intent with which acts were performed or the meanings of conversations. *See generally United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *United States v. Pedroza*, 750 F.2d 187, 200 (2d Cir.1984).

Here the government called as a witness the owner of the Crown Jewelry store on 18th Avenue, situated across the street from Telco's 18th Avenue store, who described the manner in which his own store had been robbed. His testimony was that armed robbers had entered Crown Jewelry at about 7 p.m. on November 15, 1989, and forced him to hand over $500,000 worth of jewelry. On November 18, Tinnirello and Taylor discussed that there had "just" been a robbery of an 18th Avenue jewelry store "[t]hat, uh, that was next door to the other store that they own." The circumstances of Telco's ownership of stores on both Avenue U and 18th Avenue, together with the proximity of the latter to Crown Jewelry on 18th Avenue and the short interval between the occurrence of the Crown Jewelry robbery and the November 18 conversation, were sufficient to permit the inference that by the "just" robbed store Taylor and Tinnirello were referring to Crown Jewelry.

It was within the discretion of the court to admit the Crown Jewelry owner's first-hand description of that robbery in order to explain the coconspirators' discussion of their plan to rob the Telco Avenue U store in a similar manner.

The court instructed the jury that the government did not contend that Skowronski had been involved in the Crown Jewelry robbery and that the jury should consider the testimony only for the purpose of clarifying its understanding of parts of the wiretap tapes. We conclude that there was no error and no undue prejudice.

B. *The Challenges to the Sufficiency of the Evidence*

Skowronski makes two challenges to the sufficiency of the evidence to convict him. He argues first that there was insufficient proof that he was at all involved in the planned Telco robbery. Second, he contends that if he were involved as alleged, the store would have been robbed without force or the threat of force, and hence an essential element of the alleged Hobbs Act violation would have been lacking. We reject both contentions.

█ In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden. *United States v. Maldonado-Rivera*, 922 F.2d 934, 978 (2d Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991); *United States v. Rubin*, 844 F.2d 979, 983 (2d Cir.1988); *United States v. Losada*, 674 F.2d 167, 173 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). In reviewing such a challenge, we must view the evidence, whether direct or circumstantial, in the light most favorable to the government, crediting every inference that could have been drawn in its favor, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983); *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983), and we must affirm

the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt, *United States v. Buck*, 804 F.2d 239, 242 (2d Cir.1986); *United States v. Taylor*, 464 F.2d 240, 244–45 (2d Cir. 1972). In order to prove a charge of conspiracy, the government need not present evidence of an explicit agreement; proof of a tacit understanding will suffice. *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir.), *cert. denied*, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989); *United States v. Rubin*, 844 F.2d at 984. The coconspirators need not have agreed on the details of the conspiracy, so long as they have agreed on the essential nature of the plan. *United States v. Bagaric*, 706 F.2d at 63. The defendant's knowledge of the conspiracy and participation in it with the requisite criminal intent may be established through circumstantial evidence. *See, e.g., United States v. Villegas*, 899 F.2d 1324, 1338–39 (2d Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990); *United States v. Tutino*, 883 F.2d 1125, 1129 (2d Cir. 1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990). Any challenge to the weight of the evidence is for argument to the jury, not a ground for reversal on appeal. *See, e.g., United States v. Roman*, 870 F.2d 65, 71 (2d Cir.), *cert. denied*, 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989). Skowronski has not met his heavy burden on this appeal.

█ Here, the evidence included the early references by Tinnirello and DiSomma to "Richie" as their inside man who wanted them to rob the store; the efforts of Skowronski himself, after being visited by the FBI, to get Tinnirello to go to a pay telephone so that he could be told of the serious trouble they were in in light of that visit; Tinnirello's identification of Skowronski's voice as that of "Richie"; DiSomma's confirmation of that identification and of the fact that Richie had just been "paid a visit"; and the later discussion between Tinnirello and DiSomma as to how much should be revealed to "Richie's mother." In light of this evidence, Skowronski's con-

tention that the evidence was insufficient to permit the jury to infer that he was the person referred to as the inside man, and that he was a member of the conspiracy that planned to rob his mother's store, is frivolous.

■ Skowronski's second sufficiency challenge centers on the Hobbs Act's definition of robbery. The Act makes it unlawful "in any way or degree" to "obstruct[ ], delay[ ], or affect[ ] commerce ..., by robbery or extortion or attempt[ ] or conspire[ ] so to do," 18 U.S.C. § 1951(a). For these purposes, "robbery" is defined as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, *by means of actual or threatened force*, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession." *Id.* § 1951(b)(1) (emphasis added). Skowronski argues that if he was indeed one of the coconspirators, assisting in the theft, the government could not prove that there was to be a robbery perpetrated by means of force or the threat of force as required by the Act. Though pertinent parts of the Act require the use or threat of force, Skowronski's factual premise is flawed.

First, the record belies any suggestion that the robbers meant to rob the store when only Skowronski was present. Tinnirello's telephone conversations revealed the coconspirators' awareness that other employees would be present as well. There was also ample evidence that store policy required the presence of several employees during the hours in which the store was open for business, and that in practice during the period in question the usual number of employees present, including security guards, generally ranged from four to seven. The fact that the coconspirators planned to lower the store's security gate revealed that the robbery was to take place during business hours. Obviously during those hours, customers could easily be present in the store as well. The complicity of Skowronski thus did not mean that there would be no need for the use or threat of force against others.

Further, Tinnirello and DiSomma expressed their concern that prior to Tinnirello's trip to Brooklyn to case the store, Skowronski should be forewarned so that he did not give any indication that he knew them. The implication was that no one else was to know that the robbery was assisted by an insider or that Skowronski could identify the perpetrators; hence other persons on the premises were to assume that the robbery was an act of force, not of collaboration. Finally, for the robbery to be successful in the presence of security guards, none of whom was implicated in the crime, at least a threat of force would presumably be required.

In sum, the evidence was ample to permit a rational juror to infer beyond a reasonable doubt that Skowronski was a member of the conspiracy whose objective was to rob a store by force or threat of force in the presence of innocent victims. The evidence was thus sufficient to support his conviction for conspiracy to violate the Hobbs Act.

## C. *The Challenges to Sentencing*

Skowronski makes two challenges to the district court's calculation of his sentence under the federal Sentencing Guidelines ("Guidelines") (references are to the November 1, 1991 version of the Guidelines unless otherwise indicated). Skowronski contends that the court erred in increasing his offense level because his offense involved firearms and in refusing to reduce his offense level because his offense was conspiracy. Neither contention has merit.

### 1. The Increase for Possession of Weapons

■ Applying the 1990 version of Guidelines § 2B3.1(b)(2)(C) because the 1991 version would have been less favorable to Skowronski, the district court increased Skowronski's offense level for possession of firearms. Section 2B3.1(b)(2)(C) (1990 version) requires a three-level enhancement "if a dangerous weapon (including a firearm) was brandished, displayed, or possessed" in connection with a robbery offense. *See also* Guidelines § 2X1.1 Ap-

plication Note 2 (indicating that such an enhancement is proper for defendants who were arrested during the conspiratorial stage of planning an armed robbery). The court applied the weapons enhancement because it found that the conversations between Skowronski's coconspirators "established that the conspiracy to rob Telco contemplated the use of firearms." (Sentencing Transcript dated December 3, 1991 ("Tr."), at 8.) Skowronski challenges that finding on appeal. We reject his challenge.

The sentencing court's findings of fact are not to be overturned unless they are clearly erroneous. *See United States v. Parker*, 903 F.2d 91, 103 (2d Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990). The evidence at trial included ample direct and circumstantial evidence that the coconspirators had intended to be armed and to display guns when they robbed the Telco store. First, it was inferable that they planned to be armed from the fact that they knew that (a) noncooperating persons, *i.e.*, persons other than Skowronski, would be present, and (b) the store employed security guards. Further, Tinnirello told other coconspirators that he planned to pattern the Telco robbery on the Crown Jewelry store robbery; the owner of Crown Jewelry testified that one of the robbers had stuck a gun in his back. Finally, in recorded conversations, Tinnirello and DiSomma discussed their possession of "murrays," a code word the jury could infer meant guns, as in one conversation Tinnirello told his brother he had cut down "one a [*sic*] the Murrays I got" with a pipe cutter and that he needed a saw and sandpaper in order to "cut the stock down." A few days after the FBI agents informed Skowronski of their knowledge of the planned Telco robbery, Tinnirello warned DiSomma to get rid of "Mr. Murray." DiSomma responded that he had already found Mr. Murray a new home and had warned Skowronski to do the same.

Thus, the record amply supports the district court's finding that the plan to rob Telco included the use of firearms.

**2. The Guidelines Offense Level for Hobbs Act Conspiracy**

As discussed above, the Hobbs Act prohibits the obstructing of interstate commerce by means of, *inter alia*, robbery or extortion, and explicitly prohibits "conspir[acy] so to do." 18 U.S.C. § 1951(a). For violations of the Act, § 2E1.5 of the Guidelines, entitled "Hobbs Act Extortion or Robbery," provides for application of the guideline involving the type of conduct at issue. Thus, § 2E1.5 provides that when the Hobbs Act violation involved robbery, "§2B3.1 (Robbery)" should be applied. The district court calculated Skowronski's sentence by reference to the base offense level provided in § 2B3.1(a).

Skowronski urged the court also to apply Guidelines § 2X1.1, entitled "Attempt, Solicitation, or Conspiracy (Not Covered by a Specific Offense Guideline)," which provides generally that the base offense level for conspiracy is the base offense level for the offense that was the objective of the conspiracy, but is "decrease[d] by 3 levels, unless the defendant or a coconspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control." Guidelines § 2X1.1(b)(2). The district court rejected Skowronski's request for a three-point reduction in offense level under this section, stating in pertinent part as follows:

> While defendant's conviction under the Hobbs Act is based on a conspiracy, there is no indication that the Commission intended to sentence such Hobbs Act convictions differently from other Hobbs Act convictions. This result makes sense because the Hobbs Act makes no distinction between attempt, conspiracy, and completed robbery. Therefore, it is logical that the Guidelines punish all these three types of violations in the same manner.

(Tr. 7.) We agree.

Section 2X1.1, by its terms, is to be used to decrease the offense level for a

conspiracy conviction only when the conspiracy offense is not covered by a specific offense guideline. This would occur most often when the prosecution is under 18 U.S.C. § 371 (1988), which prohibits conspiracy to commit an offense against the United States; § 371 thus encompasses conspiracies to violate statutory provisions that prohibit only a substantive offense but do not themselves prohibit conspiracy. The Commentary to Guidelines § 2X1.1 lists as the principal statutory provisions to which it applies "18 U.S.C. §§ 371 [conspiracy to violate federal law or to defraud the United States], 372 [conspiracy to impede or injure United States officer], and 2271 [conspiracy to destroy vessels on the high seas]"; it does not mention 18 U.S.C. § 1951.

Section 2X1.1(c)(1) instructs that "[w]hen an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section, apply that guideline section." We do not interpret this instruction, as it applies to conspiracies, to mean that the word "conspiracy" itself must appear in the "[ ]other" guideline to be applied; rather, we also consider conspiracy to be expressly covered by a given guideline if the guideline expressly covers a stated statutory section and that section expressly prohibits conspiracy. *Cf. United States v. Williams*, 891 F.2d 962, 965 (1st Cir.1989) (§ 2X1.1 reduction of offense level for "attempt" does not apply when offense of conviction is violation of a statutory section that itself expressly prohibits attempts). Thus, where the statutory section defining the offense of conviction prohibits conspiracy, and that section is expressly covered by a particular guideline, the offense level provided by that guideline is controlling, and § 2X1.1 does not apply.

The Hobbs Act, unlike many substantive provisions of the Criminal Code, specifically prohibits not only substantive conduct but also conspiracy. Thus, it is as much a violation of § 1951 to conspire to commit a robbery affecting interstate commerce as it is to commit such a robbery. Since § 2E1.5 of the Guidelines expressly covers § 1951, we conclude that that is the section of the Guidelines that controls the determination of the offense level of a defendant convict-

ed of Hobbs Act conspiracy, and that the district court properly ruled that § 2X1.1 does not apply.

### CONCLUSION

We have considered all of Skowronski's arguments on appeal and have found them to be without merit. The judgment of conviction is affirmed.