UNITED STATES of America, Appellee,

v.

Steven Peter AMATO and Nicola Sinis, Defendants–Appellants,

John SINIS, Defendant.

Nos. 77, 97, Dockets 94–1014(L), 94–1015.

United States Court of Appeals,
Second Circuit.

Argued Sept. 22, 1994.

Decided Jan. 25, 1995.

Stephen V. Manning, Asst. U.S. Atty., Christopher F. Droney, U.S. Atty., D. Connecticut, New Haven, CT, for appellee U.S.

Thomas G. Dennis, Hartford, CT, for defendant-appellant Steven Peter Amato.

Earle Giovanniello, Bridgeport, CT (Frank J. Riccio, on the brief), for defendant-appellant Nicola Sinis.

Before: PRATT, LEVAL, and CALABRESI, Circuit Judges.

LEVAL, Circuit Judge:

Defendants Steven Amato and Nicola ("Nick") Sinis appeal from sentences imposed in the U.S. District Court for the District of Connecticut, Alfred V. Covello, *Judge,* upon their convictions for conspiracy to interfere with commerce by robbery, in violation of 18 U.S.C. § 1951 (Hobbs Act). Amato pleaded guilty just prior to trial under a cooperation agreement and testified as a government witness. Nick Sinis was found guilty; the jury acquitted his brother John Sinis. On December 10, 1993, the court sentenced Amato and Nick Sinis. Amato's final adjusted Offense Level under the U.S. Sentencing Guidelines (after several adjustments and a one-level departure) was 21, with a Criminal History Category of III. He was sentenced within this range to 51 months imprisonment, and three years' supervised release, plus a $50 special assessment. Sinis's final adjusted Offense Level was found to be 24, with a Criminal History Category of II. He was sentenced within this range to 57 months imprisonment, followed by three years' supervised release, and a $50 special assessment.

## Background

### 1. *The planned robbery.*

In June or July of 1992, Nick Sinis and his brother, John Sinis, approached Steven Amato about committing a robbery. The Sinis brothers told Amato that they knew of a local businessman who regularly walked from his place of business, Sea Crest Trading of Connecticut, Inc. ("Sea Crest"), to the Fleet Bank across the street with large amounts of cash for deposit. Because the Sinis brothers lived less than two miles from the site of the proposed robbery and risked recognition, they needed an outsider to do the job. John explained to Amato that they had learned of the prospective victim's deposit pattern from John's girlfriend (later determined to be Kathleen Macabbee), who worked in the bank.

Amato and the Sinis brothers visited the site of the proposed robbery several times to prepare for the robbery. On several mornings, they observed their victim walk across

the street carrying a brown paper bag and enter Fleet Bank.

In June or July 1992, the three, assisted by one Jason, made two aborted attempts at the robbery. Shortly after the second attempt, Amato was arrested and detained in a New Jersey jail for violating a restraining order in a domestic relations dispute. In jail he met Peter Martin, whom he recruited to help with the robbery. Martin, however, became an informant for the FBI and began to provide the FBI with information about the plan.

On October 26, 1992, some weeks after both Amato and Martin were released from jail, Amato called Martin and told him he would come to New Jersey to get Martin to do the robbery the next day. That evening, Amato met with Martin in Martin's apartment. Martin had met earlier with the FBI and had agreed to wear a transmitter. The FBI monitored and recorded much of Martin's conversations.

Amato told Martin that two brothers were involved in the plan to commit the robbery. He related, among other things, that he and his "partners" had been watching a man bring bags of money to the bank for weeks and that they had a girl in the bank who knew daily what he deposited. Amato explained that because he and the brothers were known in the area, they could not perform the robbery. Amato said that he and Martin would meet the brothers that evening in New York to discuss the robbery.

The robbers expected that the robbery would yield between $60,000 and $100,000. The tape recording indicates that Amato told Martin that there would be $60,000–100,000 in the bag on Tuesday morning. (In fact, Fleet Bank's Currency Transaction Report for that day showed a cash deposit by Sea Crest of $80,916.)

Before they left the apartment, Amato called the Sinis family residence to tell the Sinis brothers that he and Martin were on their way. Neither Nick nor John was home, and Amato told their sister, Maria, to tell Nick he was on his way to the house and would see Nick that night.

Soon after, Amato and Martin left New Jersey and drove toward New York City, followed by FBI agents. While the agents were within the range of Martin's transmitter, they were able to monitor the conversation. Near the George Washington Bridge, the FBI lost sight of the car and thereafter, little conversation was received and recorded. Amato and Martin went first to inspect the robbery site, then to the Sinis home where the four men met to discuss the plan. Nick Sinis, Amato, and Martin spent the night in a Super 8 Motel.

The next morning, watched by FBI agents, Nick drove Amato's car from the Super 8 Motel to the robbery site, with Amato sitting in front and Martin sitting in back. They then met with John to discuss their plan. They realized that they did not have mace, which they planned to use to disable the man carrying the money. They knew that the man carried a handgun in the small of his back on his trips to the bank. Nick, Amato, and Martin left to buy mace, then returned to the Sinis home and met again with John.

Their plan was for Martin to spray the victim with mace, grab the money, and run to the car driven by Nick, who would then drive to I–95 and into New York. Amato would follow; if necessary, Martin would leave Nick's car and ride with Amato. John would drive in the robbery area acting as a "crash car"; that is, in case of police pursuit, he would cause an accident to keep the police from apprehending them.

Before they left the Sinis home, and outside of Martin's presence, Amato told John that he did not need to be at the robbery scene. This was not repeated to Martin, lest it impair his confidence.

Early on the 27th, Martin and Nick drove to the area of the bank, and Amato drove there in another car. Martin got out of the car and went to the planned location of the robbery with the mace. He waited on the street to make contact with the FBI agents. He had been told by the New Jersey FBI that Connecticut FBI agents would be in the area. After waiting some time, Martin went into a stationery store to call the New Jersey FBI. The New Jersey FBI contacted the agents on the scene, and an agent ap-

proached Martin in the store. Martin told the agent, among other things, that the robbery was still on, that Amato and Nick were parked in separate cars on the next street, that John was in the area in an unknown vehicle to act as a crash car, and that John's girlfriend was the source of information at Fleet Bank.

At this point, the agents arrested Nick and Amato. Before trial Amato entered into a cooperation agreement with the government; he pleaded guilty, and testified against Nick and John Sinis.

### 2. Evidence of Nick's obstruction of justice.

At trial, Nick Sinis testified in his defense that he took part in the robbery only because Amato had held a gun to his head and threatened to kill him if he did not participate. He testified, among other things, that he had not expected Amato to visit his house on the night preceding the robbery attempt and that John was not home that night. He testified that Amato held a gun to his head in Martin's presence, and that Nick and Martin saw Amato throw that gun into the river behind the bank parking lot. Nick also testified that he was not driving Amato's car the next morning, but that Amato drove him and Martin away from the Super 8 Motel, with Nick in the car as an unwilling passenger.

Nick's testimony was contradicted in several ways. Martin testified as a government witness that he had not seen Amato threaten Nick with a gun or throw a gun in the river. Martin testified that Nick was a willing participant in the robbery and had talked about how he watched the victim for weeks. Amato, also testifying as a government witness, gave testimony consistent with Martin's. Nick's testimony regarding the drive away from the motel is contradicted by both Martin and an FBI agent who observed the three men in the car. The FBI agent testified that Nick drove Amato's car, with Martin in the back seat. Other points in Nick's testimony were also contradicted.

Soon after the arrests, Nick visited Amato's brother Eugene. Eugene Amato testified that Nick told him of a plan: Steve Amato should tell the FBI that he, Steve, had threatened Nick with a gun and forced him to participate in the robbery. Nick would set up a drug dealer for the government, so that all the defendants, including Steve Amato, would be let off of the robbery charge. Nick asked Eugene to visit Steve Amato in the Bridgeport Community Correctional Center to propose this plan. Eugene refused. Soon after, Nick visited Steve Amato twice himself to propose that he adopt Nick's story. Amato did not do so.

### Discussion

Defendants Amato and Sinis appeal several aspects of the calculation of their sentences under the U.S. Sentencing Guidelines. Because we find errors in the application of the guidelines and failure to make necessary findings, we vacate the sentences and remand for resentencing with express findings.

### 1. The applicable guideline for a robbery conspiracy and the propriety of an upward adjustment for intended but unrealized loss.

The initial question faced at sentencing was whether a Hobbs Act robbery conspiracy falls under the U.S. Sentencing Guideline provision for conspiracy, § 2X1.1, or that for robbery, § 2B3.1. United States Sentencing Commission, *Guidelines Manual*, § 2X1.1, § 2B3.1 (Nov. 1993). The district court followed *United States v. Skowronski*, 968 F.2d 242 (2d Cir.1992), and sentenced under § 2B3.1 of the Guidelines, providing a base offense level of 20. The court then added two levels under § 2B3.1(b)(6) because the conspirators intended a loss of more than $50,000. Amato and Sinis contend that the court erred in making that adjustment.

The problem goes back to the issue determined by this court in *Skowronski*. In that case the defendant, also convicted of a Hobbs Act robbery conspiracy, argued that his sentence level should be set under § 2X1.1, the conspiracy guideline, rather than § 2B3.1, the robbery guideline. The principal advantage to the defendant would have been that, for conspiracies in which the substantive offense conduct was not substantially completed, § 2X1.1(b)(2) provides for a three-level reduction from the offense level specified for

the substantive offense, plus adjustments for intended offense conduct.

Section 2X1.1, however, covers only conspiracies that are not expressly covered by another guideline section. Section 2X1.1(c)(1) specifies that "[w]hen a[] ... conspiracy is expressly covered by another offense guideline section, [the court should] apply that guideline section" [rather than § 2X1.1]. The government there argued, and this court agreed, that because the Hobbs Act's prohibition included not only robbery, but also conspiracy to rob, and because Guideline § 2E1.5 assigned violations of the Hobbs Act (implicitly including conspiracies) to specified guidelines, including § 2B3.1 for robbery, the guideline for robbery should be deemed to "expressly cover[ ]" a Hobbs Act robbery conspiracy, with the consequence that the conspiracy guideline, § 2X1.1, would not apply. *Skowronski*, 968 F.2d at 250.

The government and the defendants have thus assumed that, under *Skowronski*, the defendants would not receive the benefit of the three-level reduction provided by § 2X1.1 for a conspiracy that has not matured into a substantially completed substantive offense.

Nonetheless, Amato and Sinis argue that the *Skowronski* rule, which sentences them under the robbery guideline rather than the conspiracy guideline, has certain benefits for them, of which the district court deprived them.

■ With respect to adjustment for loss, § 2B3.1(b)(6) (unlike § 2X1.1) makes no adjustment for losses that were intended as part of the offense but were not realized. This section provides upward adjustments "[i]f the loss *exceeded*" $10,000, $50,000, $250,000, etc. USSG § 2B3.1(b)(6) (emphasis added). It specifies no adjustment for losses that were intended but not realized. This provision contrasts sharply with the corresponding language of § 2X1.1, which mandates "adjustments [to the base level guideline for the intended substantive offense] ... for any *intended* offense conduct." USSG § 2X1.1(a) (emphasis added).

Furthermore, the Commentary to § 2B3.1 supports the defendants' argument that this adjustment is not intended to cover losses that were intended but not realized. Application Note 3, covering "valuation of loss," refers us to the Commentary to § 2B1.1 (Larceny, Embezzlement and Other Forms of Theft). Under that section, Application Note 2 asserts that " 'Loss' means the value of the property taken, damaged or destroyed." This Application Note goes on to say

> In the case of a partially completed offense (*e.g.*, an offense involving a completed theft that is part of a larger, attempted theft), the offense level is to be determined in accordance with the provisions of § 2X1.1 (Attempt, Solicitation, or Conspiracy) whether the conviction is for the substantive offense, the inchoate offense (attempt, solicitation, or conspiracy), or both; *see* Application Note 4 in the Commentary to § 2X1.1.

USSG § 2B1.1, comment. (n. 2).

The cross-reference to the Application Notes to § 2X1.1 likewise refers to situations where part but not all of the intended proceeds have been successfully stolen.

> For example, where the intended offense was the theft of $800,000 but the participants completed (or were about to complete) only the acts necessary to steal $30,000, the offense level is the offense level for the theft of $800,000 minus 3 levels, or the offense level for the theft of $30,000, whichever is greater.

USSG § 2X1.1, comment. (n. 4).

This commentary rather clearly contradicts the proposition that, where a conspiracy (or attempt) fails to realize the theft of any property, an adjustment should nonetheless be made for the full extent of the property intended to be stolen. Such an interpretation would render all the above quoted commentary meaningless.

The government argues that to fail to increase for intended offense conduct would substantially deviate from the intentions of the guidelines and produce unjustifiable disparities. Section 2X1.1, the section designed to cover conspiracies and attempts resulting in inchoate crimes, unquestionably intended upward adjustments for intended, unrealized

defense conduct. Such upward adjustments could be very substantial—amounting to increases of 15 levels or more where there was an intention to do violence and to steal large amounts. We agree with the government, furthermore, that it would seem a perverse interpretation of the Guidelines to fail to increase the penalty for aggravated unrealized intentions when § 2X1.1 makes so clear that such increases were contemplated by the Guidelines for conspiracies. The government (perhaps regretting its argument in *Skowronski* upon perceiving the problem of upward adjustments for intended conduct under § 2B3.1) now contends that the sentence should be fashioned as a hybrid—drawn under § 2B3.1, the robbery guideline, to the extent necessary to deny the three-level reduction that § 2X1.1 would have provided, but drawn under § 2X1.1 to the extent necessary to obtain the increases for losses intended but not realized. In effect, this argument urges that in negotiating the bewildering shoals of Guidelines sentencing, the Rules of the Road should be to take whatever turn favors the government. We cannot accept this approach.[1]

Fortunately, however, the dilemma is solved by an intervening change in the text of the Guidelines. When *Skowronski* was decided, § 2E1.5 of the Guidelines expressly referred Hobbs Act violations to various other guidelines, including § 2B3.1 for Hobbs Act robberies (and, by inference, Hobbs Act robbery conspiracies). That provision, however, was deleted from the Guidelines. USSG App. C, amend. 481 (Nov. 1993). As noted above, § 2X1.1 covers conspiracies in all cases, except when "conspiracy is expressly covered by another offense guideline section." USSG § 2X1.1(c)(1). The deletion of § 2E1.5, with its cross-reference to § 2B3.1, deletes the provision of the Guidelines that provided the "express" reference making § 2X1.1 inapplicable. With that provision gone, nothing remains in § 2B3.1 (Robbery) to suggest, much less "expressly" state, that it intends to cover conspiracies.

■ We conclude that this change in the text of the Guidelines requires a return to the problem decided in *Skowronski.* Now that there is no longer a provision of guidelines directing Hobbs Act conspiracies to § 2B3.1, they are covered by the conspiracy guideline, § 2X1.1. It is true that *Skowronski* also noted that the Hobbs Act included conspiracy in its explicit terms, as well as the substantive offenses it covers, and inferred an intent of Congress to have such conspiracies sentenced similarly to the substantive violations. *Skowronski,* 968 F.2d at 249–50. Nonetheless, we view the court's discussion of Congressional intent as supportive reasoning, rather than basic justification, for treating Hobbs Acts conspiracies under § 2B3.1, rather than § 2X1.1. After all, the determinative passage in § 2X1.1(c)(1) makes this turn not on the content of the criminal statute in question, but rather on whether the Guidelines assign the particular class of conspiracy to a section other than the general conspiracy section. While § 2E1.5 was part of the Guidelines, they did; since § 2E1.5 has been deleted, they no longer do. Accordingly, the linchpin of *Skowronski* 's reasoning has been removed.

■ We thus conclude on the specific point raised by Amato and Sinis—that the court should not have increased their sentences for intended, but unrealized losses— that they are wrong. Section 2X1.1(a), when applied to robbery conspiracies, adopts by cross-reference all the adjustments of § 2B3.1, even where the offense conduct

---

1. The government also contends that *Skowronski* ruled that upward adjustments for intended conduct are appropriate when applying the robbery guideline to Hobbs Act robbery conspiracies. In *Skowronski,* we upheld an increase under § 2B3.1(b)(2)(C), because the evidence supported the conclusion that the conspirators "intended to be armed and to display guns when they robbed the Telco store." *Skowronski,* 968 F.2d at 249. The government argues that, because the use-of-firearm guideline—like the loss guideline—expressly applies only to accomplished acts, *Skow-* *ronski* demonstrates that upward adjustments for intended acts should be made when applying § 2B3.1.

However, the court and the parties in *Skowronski* did not deal with the argument that § 2B3.1, in contrast to § 2X1.1, does not provide adjustments for *intended* conduct. The court's discussion of the issue focussed on whether the evidence showed intent to use firearms. Therefore, we do not regard *Skowronski* as having decided the issue here presented.

causing the adjustment was intended but unachieved. Defendants may well have been correct had there been no intervening guideline change so that the conspiracy would have fallen under § 2B3.1. But, as their conspiracy is now covered by § 2X1.1, they are unquestionably liable for adjustments by reason of intended conspiratorial conduct.

On the other hand, the defendants are also entitled to consideration of the question whether they should receive the three-level decrease provided by § 2X1.1(b)(2) for conspiracies that did not ripen into substantially completed offenses. This issue must be considered on remand.

■ We therefore affirm the district court's addition of two levels to the 20–level base offense by reason of the intended theft of more than $50,000. But we remand for consideration whether Amato and Sinis are entitled to receive a three-level decrease under § 2X1.1(b)(2) because their conspiracy did not come close enough to fruition, or if they are not so entitled, whether they are entitled to have their case adjudicated under the pre-existing Guidelines. *See United States v. Rodriguez,* 989 F.2d 583, 587 (2d Cir.1993) (to avoid ex post facto problem, defendant entitled to be sentenced under Guidelines as they existed at time of offense, if subsequent Guidelines change would result in more severe sentence). If the sentence, calculated under § 2X1.1, would be higher than it would have been under § 2B3.1, because of a denial of the three-level reduction while increasing for intended loss, the defendants are entitled to be sentenced under § 2B3.1 in order to take advantage of the law

as it existed, under *Skowronski,* at the time of their offense.

### 2. *Amato's two-level enhancement as an organizer.*

■ Amato argues that the district court improperly added two levels under § 3B1.1(c), "Aggravating Role," finding him to be an organizer or leader of a Hobbs Act robbery conspiracy. The district court stated that it made this adjustment based upon the "totality of all the evidence and testimony offered at trial."

The most likely source of information concerning Amato's role in the offense was Amato's own testimony, given as a government witness under a cooperation agreement. That agreement, however, provided that the information provided by Amato "may not be considered by the Court in determining [Amato's] applicable sentencing guideline range." Section 1B1.8(a), furthermore, provides that:

(a) Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.

USSG § 1B1.8(a).

Amato thus contends, and the government agrees, that the issue should be remanded because it appears the court impermissibly relied on Amato's testimony as a basis for increasing his guideline sentence range.[2]

---

**2.** It is not clear what evidence the court used to reach this finding. After sentencing, when the judge stated that the finding of "organizer leader" was based on "the totality of the testimony offered at trial," the following colloquy ensued:

MR. DENNIS: Your Honor, if I may briefly, I have a problem with the Court's sentencing in that, as I understand it, Your Honor has enhanced Mr. Amato's sentence by two levels as an organizer or leader of this offense, based upon the testimony that he gave here in court. As I understand it, this testimony was given under 1B18 immunity, which means, although the Court can consider that testimony and should be made aware, as Your Honor was, the Court cannot use that testimony to enhance

Mr. Amato's sentence. Accordingly I ask that the—

THE COURT· I'm sorry if I said that, sir, I didn't mean to. I thought I said that the totality of all the evidence and testimony offered at trial. If I didn't, that's what I meant to say.

MR. DENNIS: Well that, of course, would include Mr. Amato's testimony, Your Honor, which should not and cannot be used.

THE COURT. And I would agree, and with that correction maybe be [sic] noted.

Especially inasmuch as this discussion occurred after sentencing, we are left uncertain as to whether the district judge relied only on proper sources.

"In enhancing a defendant's sentence based on his role in the offense, a district court must make specific factual findings as to that role." *United States v. Stevens,* 985 F.2d 1175, 1184 (2d Cir.1993). · Here, the court's findings were insufficient to support its decision to enhance Amato's sentence. It also appears likely that the enhancement was based on information which Amato was entitled, under his agreement, to have excluded from consideration. We therefore remand this issue for reconsideration. If the court finds the enhancement is justified, it shall make specific findings supporting the conclusion. Also, because of the confusion as to immunized sources of information, the court should identify the evidence upon which it relies.

### 3. The extent of Amato's reduction for acceptance of responsibility.

█ For acceptance of responsibility, pursuant to § 3E1.1, Amato received a two-level reduction. Amato argues that he was entitled to an additional level of reduction.

Section 3E1.1(a) provides for a two-level decrease in offense level if the defendant "clearly demonstrates acceptance of responsibility for his offense." Section 3E1.1(b)(1) goes on to provide for further reduction of one additional level:

(b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps:

(1) timely providing complete information to the government concerning his own involvement in the offense....

USSG § 3E1.1(b).

Amato contends that he was entitled to the additional reduction under this provision because he qualified for a two-level reduction under § 3E1.1(a), his offense level was greater than 16, and he timely provided complete information to the government about his own involvement.

█ Because the district court gave no explanation, it is impossible to determine whether it relied on a valid reason for its denial of the third-level reduction. In passing sentence, courts must explain the reasons for such decisions. We remand for reconsideration, with explanation of whatever decision the court reaches.

### 4. The grant of downward departure for cooperation under § 5K1.1 without benefit to the defendant.

█ Both Amato and the government agree that remand is warranted in connection with the district court's grant of the government's motion for downward departure, pursuant to § 5K1.1, "Substantial Assistance to Authorities."

The government moved for a downward departure by reason of Amato's substantial cooperation. The district court granted the motion and departed down one level. Without this ruling Amato's guideline would have been 22 (Criminal History Category III) with a guideline range of 51–63 months; after granting the motion, reducing the level to 21 (with a range of 46–57 months), the court sentenced Amato to 51 months. The district court thus granted the motion for a departure, but nonetheless sentenced Amato to a sentence that could have been given without departure.

█ Because the court granted the government's motion for downward departure but then sentenced in a manner that gave the defendant no benefit from the downward departure, the government joins in questioning whether the resulting sentence was what the court intended. While the district court's discretionary determination of the extent of a downward departure is generally not reviewable, *United States v. Doe,* 996 F.2d 606, 607 (2d Cir.1993) (per curiam), here, the record suggests that the district court may have intended, in granting a departure, to give the defendant some benefit by reason of the departure. As we are remanding for other reasons as well, the remand will also permit the district court to revisit the issue as it finds appropriate.

### 5. The enhancement of Nick Sinis's sentence for obstruction of justice.

The district court imposed a two-level enhancement on Nick Sinis's sentence for "at-

tempt to influence the outcome of the trial," pursuant to § 3C1.1, "Obstructing or Impeding the Administration of Justice." Because the district court's finding does not explain the basis for the enhancement, Sinis and the government agree that the obstruction of justice enhancement should be remanded for factual findings.

The court may have based the enhancement on a finding that Sinis committed perjury at trial, or on his attempt to have Amato lie to the FBI about Sinis's involvement in the robbery, or on both.

 "[A] district court [may] apply the obstruction of justice enhancement for perjury only if it finds that the elements of perjury are met." *United States v. Onumonu,* 999 F.2d 43, 46–47 (2d Cir.1993). The court must make findings as to each element. *United States v. Dunnigan,* — U.S. —, —, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993); *United States v. Shonubi,* 998 F.2d 84, 88 (2d Cir.1993).

■ If the court based its adjustment on Sinis's attempt to have Amato lie to the FBI, it must find that Sinis "consciously acted with the *purpose* of obstructing justice." *United States v. Rivera,* 971 F.2d 876, 894 (2d Cir.1992) (quotation omitted); *United States v. Thomas–Hamilton,* 907 F.2d 282, 285 (2d Cir.1990).

We call the court's attention also to Application Note 1 to § 3C1.1 and the heightened standard of proof on this issue. *See United States v. Johnson,* 968 F.2d 208, 215 (2d Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 436, 121 L.Ed.2d 355 (1992); *United States v. Cunavelis,* 969 F.2d 1419, 1423 (2d Cir.1992); *Onumonu,* 999 F.2d at 45.

*6. Downward departure based on alleged duress, § 5K2.12.*

■ Nick Sinis argues that the court failed to make factual findings sufficient to support its refusal to depart downward based upon coercion or duress, pursuant to § 5K2.12, "Coercion and Duress."

Defendant's claim fails, because the court's decision not to depart downward is not open to review. "Generally, a trial judge's refusal to depart from the applicable Guidelines range is not reviewable, unless the record reflects that the sentencing judge erroneously believed that he lacked authority to depart." *United States v. Zackson,* 6 F.3d 911, 923 (2d Cir.1993) (citations omitted); *see also United States v. Speenburgh,* 990 F.2d 72, 75 (2d Cir.1993). Here, nothing in the record suggests that the district judge had concluded that he did not have the legal authority to depart.[3]

### Conclusion

For the reasons discussed above, the sentences of Steven Amato and Nicola Sinis are vacated and remanded for reconsideration and for factual findings justifying the decisions reached.

---

**3.** Although district courts are not required to explain a denial of a requested departure, it is generally the better practice for the sentencing court to reveal its awareness of the request (by stating that the request for departure is denied or otherwise), so that the reviewing court can be certain that the failure to depart did not result from lack of awareness of the application.