**UNITED STATES of America**

v.

**Michael GROVE and Kevin Lamontt Whitfield.**

**No. CR 00–152–N.**

United States District Court,
M.D. Alabama,
Northern Division.

June 1, 2001.

Raymond A. Pierson, U.S. Attorney's Office, Montgomery, AL, for U.S.

Thomas Martele Gaggans, Montgomery, AL, for Kevin Lamontt Whitfield.

Christine A. Freeman, Federal Defender, Montgomey, AL, for Michael Grove.

## OPINION

MYRON H. THOMPSON, District Judge.

Defendants Michael Grove and Kevin Lamontt Whitfield each entered a guilty plea to the offense of escape; they are now before the court for sentencing. There are two issues in dispute: (1) whether defendants' escape conduct falls within § 2P1.1(b)(2) of the United States Sentencing Guidelines, which provides generally that escapees from low-security facilities who return to custody voluntarily within 96 hours will receive a seven-level "downward adjustment" from that of the base-offense level for prison escapes; and (2) whether, if defendants are not eligible for a § 2P1.1(b)(2) downward adjustment, they should still receive a comparable "downward departure" under § 5K2.0 of the Guidelines. For the reasons set forth below, the court holds that a § 2P1.1(b)(2) seven-level downward adjustment is not appropriate and that a § 5K2.0 three-level downward departure is.

## I. BACKGROUND

On September 1, 2000, while inmates at the low-security Maxwell Federal Prison Camp in Montgomery, Alabama, defendants walked off the prison-camp confines between 4:00 and 6:00 p.m. and returned to the vicinity around 9:00 p.m. Whitfield's stated motive for leaving the camp was to meet with a woman at a nearby housing project because he had not had sex in eight years; Grove's stated motive was to retrieve $ 8,000 buried in his grandmother's Montgomery backyard and give $ 5,000 of it to the mother of his daughter to pay for his daughter's special needs, and give the remaining $ 3,000 to an unnamed friend to be sent to Grove in the event he developed some future need for money.

Defendants never intended their escape to be longer than a short escapade; both returned around 9:00 p.m. because they wanted to reintegrate themselves into the prison population before the 10:00 p.m. headcount so that their absence might go undetected. However, their attempt to return unobtrusively had already been foiled shortly after their departure. Prison officials had been alerted to the escape around 5:00 p.m. by a phone call from Maxwell Air Force Base personnel who had sighted defendants walking off the prison-camp premises. Upon defendants' return, they were intercepted by prison officers who ordered them to "stop and get down on the ground." Both defendants made an initial effort to evade the officers before surrendering to them. Their attempted evasion was not an attempted escape from the prison camp but rather an effort to run around the officers in order to slip back into prison-camp life undetected.

A later search of Whitfield uncovered four pairs of sunglasses, a Timex watch, a flammable lighter, and $ 71 in his socks. A search of Grove turned up $ 80 in his socks.

In January 2001, the Bureau of Prisons held disciplinary hearings for defendants and meted out administrative punishment for the escape, taking away some of their good-time credits, sentencing them to 30 days of segregated confinement (deemed to be time served), and recommending their transfer to a more secure institution.

On September 26, 2000, defendants were each indicted on one count of escape under 18 U.S.C.A. § 751(a), and, on November 29, both pled guilty to the charge. In its presentence report, the probation department recommended against a seven-level downward adjustment under U.S.S.G. § 2P1.1(b)(2). Defendants maintain that they are entitled to a § 2P1.1(b)(2) downward adjustment or, if not that, then a comparable downward departure pursuant to U.S.S.G. § 5K2.0.

## II. § 2P1.1(b)(2) DOWNWARD ADJUSTMENT

Because defendants were in custody at Maxwell on account of drug convictions, § 2P1.1 (a)(1) of the United States Sentencing Guidelines sets their base-offense level at 13.[1] Defendants contend, as stated, that they are entitled to a seven-level reduction based on the specific-offense characteristic described in § 2P1.1 (b)(2); the government maintains that they are not. Section 2P1.1(b)(2) states that:

> "If the defendant escaped from non-secure custody and returned voluntarily within ninety-six hours, decrease the offense level under § 2P1.1(a)(1) by 7 levels .... *Provided*, however, that this reduction shall not apply if the defendant, while away from the facility, committed any federal, state, or local offense punishable by a term of imprisonment of one year or more."

The government concedes that confinement at Maxwell prison camp qualifies as "non-secure custody" and that defendants returned to the Maxwell vicinity within three to five hours and thus well "within ninety-six hours."

### A. The "returned voluntarily" requirement

█ The government's primary case for denying the seven-level adjustment to defendants rests on its contention that the phrase "returned voluntarily" in § 2P1.1(b)(2) should be construed to apply to only those escapees who do not attempt to conceal the fact of their absence. To advance this position, the government has relied primarily on policy arguments, introducing, for example, testimony of the Maxwell warden that low-security facilities, much more than high-security ones, need the deterrence of a steep penalty for escapes because the former have less force at their disposal and must depend primarily upon the behavioral restraint of inmates.[2] Defendants respond that the "carrots" at a low-security facility are stronger than the "sticks" because inmates value the privilege of serving their time at a place like Maxwell enough that the fear of transfer to a higher-security facility is itself usually a sufficient deterrent against escape.

While the warden undoubtedly has some specialized policy competence in this area, most of the government's policy arguments along these lines, regardless of their merits, are not properly cognizable by this court because they are inconsistent with the policy choices built into the § 2P1.1(b)(2) adjustment which, by its terms, plainly assesses deliberately temporary absences from low-security facilities as significantly lesser offenses than attempted permanent escapes from any facility.

The only policy argument by the government that might plausibly be reconciled with the policy choices instantiated in § 2P1.1(b)(2) is the assertion that, "It goes against the purposes and spirit of this

---

1. Under § 2P1.1 (a)(1), the base-offense level for escape from confinement "by virtue of an arrest on a charge of felony, or conviction of any offense" is 13.

2. The Bureau of Prisons has elsewhere created a categorization that seems at odds with the government's testimony that escapes from low-security facilities warrant greater punishment than escapes from high-security facilities. *See United States v. Kahn*, 789 F.Supp. 373, 377 (M.D.Ala.1992) (Thompson, J.) (stating that the Bureau of Prisons "categorizes escapes into two levels of severity: the first being escapes from escort, a secure institution, or a non-secure institution using violence, which are considered prohibited acts of the 'greatest severity'; and the second being escapes without violence from an unescorted community program, a non-secure institution, or from outside a secure institution, which are considered acts of 'high severity' ") (citing 28 C.F.R. §§ 500.1(a), (d), and 541.13 (1991)).

specific offense characteristic to reward an inmate for his intention to carry out undetected escapes from prison" because an "obvious motivation" for the adjustment is "to encourage an inmate's immediate recognition of his crime and mitigation of the adverse consequences."[3] The court agrees with the government that "an inmate's immediate recognition of his crime and mitigation of the adverse consequences" is an "obvious motivation" for the adjustment. In fact, in a previous case, this court decided to make a downward departure by analogy to § 2P1.1(b)(2) for an escapee because, although he did not fall within the literal terms of the specific-offense characteristic, he had felt remorse and had manifested an intent to confess and turn himself in before he was caught. *See United States v. Birchfield,* 709 F.Supp. 1064, 1069 (M.D.Ala.1989) (Thompson, J.) (downward departure—by analogy to the § 2P1.1(b)(2) adjustment that is accorded an escapee who leaves a non-secure facility and returns within 96 hours—was warranted where despondent escapee left camp to visit with his family for a second time at the end of the day's visiting hours, and manifested an intent to return to camp within a short period of time even though he was arrested before he could in fact return).

However, there is every reason to think that the "obvious motivation" for the adjustment (a defendant's immediate recognition of his crime and confession) cannot be the only motivation for the adjustment. First, while there is no doubt that a calculated and undetected temporary escape is worse for the Bureau of Prisons than a temporary escape of which an inmate has voluntarily repented and confessed, it is perfectly intelligible for the Sentencing Commission to have drawn the most significant line between attempted permanent escapes and temporary escapes (whether confessed or concealed) followed by voluntary return. As discussed by this court in a previous case, the social costs of a permanent escape attempt are likely to be significantly higher than those of a temporary escape with a voluntary return. *See Birchfield,* 709 F.Supp. at 1069–1070. Further, it is reasonable to think that, as a general matter, the culpability of an inmate who attempts to "steal" the remainder of the sentence he owes society is of a greater magnitude than that of an inmate who "steals" only a small fraction of his sentence, even an inmate who attempts to do his 'stealing' furtively. Second, and more decisively, if the Sentencing Commission had wanted the seven-level adjustment to apply to spontaneously remorseful and confessing escapees only, it could easily have drafted § 2P1.1(b)(2) narrowly and expressly to cover only that subset of voluntarily returning escapees; yet, it has not done so.

The one textual argument offered by the government is its claim that the phrase "returned voluntarily" necessarily entails voluntary surrender or confession to authorities, thus excluding attempts to return undetected. This interpretation is at odds with § 2P1.1's Application Note 2 which states that " 'returned voluntarily' includes voluntarily returning to the institution *or* turning one's self in to a law enforcement authority as an escapee (not in connection with an arrest or other charges)." (Emphasis added). "[T]urning one's self in to a law enforcement authority as an escapee" is offered in this note in the disjunctive as an alternative to "voluntarily returning to the institution." The plain language of "voluntarily returning to the institution" is satisfied by an escapee's non-coerced choice to return to the *location* of the institution and need not entail a voluntary return to the control of specific

---

**3.** Government's response to defendant's motion, filed February 20, 2001, p. 3.

*persons* within that institution nor any voluntary self-incrimination.

This common-sense textual interpretation is reinforced by the fact that the Bureau of Prisons concededly would not ordinarily charge an inmate with escape from custody for merely disobeying an officer and leaving an authorized location in the camp for an unauthorized location within the camp. Perhaps "return" to a high-security facility might more plausibly be defined narrowly as submission to some literal physical restraint, such as a cell or guard. But, in a low-security camp like Maxwell, where inmates apparently legitimately walk around unattended for hours in between the scheduled head-counts, it makes no sense to read the definitional terms "returning to the institution" to be implicitly incorporating a requirement of submission to an officer.

Finally, while the government has not expressly argued that inmates must be back within the official boundaries of their prison in order to have "returned" for purposes of § 2P1.1(b)(2), the government implicitly advocates this interpretation because a great deal of its testimony and argument was devoted to efforts to discern whether defendants were on or just outside the official property of the Maxwell prison camp at the time of their surrender to the Prison Bureau officers. However, defendants' precise location at the time of their surrender (while relevant on the issue of defendants' intent) is not determinative here given that all parties agree that defendants returned to the Maxwell vicinity in order to re-integrate themselves into prison life. Given that, at worst, one defendant may have been just outside the

official camp boundaries and that defendants' initial reluctance to surrender to the officers was an attempt to evade the officers rather than an attempt to evade the camp, application of the § 2P1.1(b)(2) adjustment is not necessarily precluded.

The government's desire, therefore, to punish escape conduct that falls within the terms of the § 2P1.1(b)(2) adjustment at a higher imprisonment range when the inmate's return is furtive cannot be reconciled with the plain text of the Guidelines. The government can, however, still plausibly argue that, *within* a given Guideline range, attempted undetected escapes should get a higher sentence than that given self-confessed escapes, and, of course, the Bureau of Prisons is free to take furtive behavior into account in its administrative punishments. But, when the literal terms of the § 2P1.1(b)(2) specific-offense characteristic apply, courts are not free to distort those terms in order to single out the furtive aspect of an escapee's conduct for extra deterrence or punishment above a given guideline range.[4]

Defendants "returned" to Maxwell within the literal terms of § 2P1.1(b)(2). And they undisputably did so of their own accord and within several hours of their departure. Thus, this court holds that defendants "escaped from non-secure custody and returned voluntarily within ninety-six hours," and that § 2P1.1(b)(2)'s seven-level downward adjustment applies unless the government can prove that defendants engaged in conduct that runs afoul of § 2P1.1(b)(2)'s disqualifying-offense proviso, an issue to which the court now turns.

4. All of the government's arguments in favor of a higher base-offense level have been offered as interpretations of the § 2P1.1(b)(2) adjustment; the government did not move for an upward departure pursuant to U.S.S.G. § 5K2.0. Thus, the court's discussion should

not be understood to preclude that there might be circumstances surrounding a defendant's furtive return that would warrant an upward departure despite the applicability of § 2P1.1(b)(2).

### B. *The disqualifying proviso*

The government's secondary argument for denying application of the seven-level adjustment is that defendants, "while away from the facility, committed a[ ] federal ... offense punishable by a term of imprisonment of one year or more," U.S.S.G. § 2P1.1(b)(2); this argument turns out to be more successful than the primary policy-based objection. The government argues that, by possessing between $ 70 and $ 80 in their socks, defendants possessed "prohibited objects" in violation · of 18 U.S.C.A. § 1791 and that this violation falls within § 2P1.1(b)(2)'s disqualifying proviso.[5] This argument for the applicability of the disqualifying proviso on the basis of a § 1791 violation raises a number of troubling legal questions. Ultimately, however, the court is persuaded, by a preponderance of the ˙evidence, that defendants concealed currency in their socks in an attempt to smuggle it into the Maxwell prison camp, and that, in doing so, they committed a § 1791 offense that falls within the § 2P1.1(b)(2) proviso.

### 1. *The "while away from the facility" requirement*

This court will first consider whether the government has established that, as required by the terms of § 2P1.1(b)(2)'s disqualifying proviso, defendants committed an offense "while away" from Maxwell (as opposed to an offense committed at Maxwell). Section 1791 makes it a crime for a federal prison inmate to possess or

---

**5.** 18 U.S.C.A. § 1791 provides:
"Providing or possessing contraband in prison
(a) Offense.—Whoever—
(1) in violation of a statute or a rule or order issued under a statute, provides to an inmate of a prison a prohibited object, or attempts to do so; or
(2) being an inmate of a prison, makes, possesses, or obtains, or attempts to make or obtain, a prohibited object;
shall be punished as provided in subsection (b) of this section.
(b) Punishment.—The punishment for an offense under this section is a fine under this title or—
(1) imprisonment for not more than 20 years, or both, if the object is specified in subsection (d)(1)(C) of this section;
(2) imprisonment for not more than 10 years, or both, if the object is specified in subsection (d)(1)(A) of this section;
(3) imprisonment for not more than 5 years, or both, if the object is specified in subsection (d)(1)(B) of this section;
(4) imprisonment for not more than one year, or both, if the object is specified in subsection (d)(1)(D) or (d)(1)(E) of this section; and
(5) imprisonment for not more than 6 months, or both, if the object is specified in subsection (d)(1)(F) of this section.

(d) Definitions.—As used in this section—
(1) the term 'prohibited object' means—

(A) a firearm or destructive device or a controlled substance in schedule I or II, other than marijuana or a controlled substance referred to in subparagraph (C) of this subsection;
(B) marijuana or a controlled substance in schedule III, other than a controlled substance referred to in subparagraph (C) of this subsection, ammunition, a weapon (other than a firearm or destructive device), or an object that is designed or intended to be used as a weapon or to facilitate escape from a prison;
(C) a narcotic drug, methamphetamine, its salts, isomers, and salts of its isomers, lysergic acid diethylamide, or phencyclidine;
(D) a controlled substance (other than a controlled substance referred to in subparagraph (A), (B), or (C) of this subsection) or an alcoholic beverage;
(E) any United States or foreign currency; and
(F) any other object that threatens the order, discipline, or security of a prison, or the life, health, or safety of an individual;

(4) the term 'prison' means a Federal correctional, detention, or penal facility.

attempt to possess unauthorized currency. The government has alleged that defendants committed a completed, simple-possession violation of § 1791 [6] or, alternatively, an attempted smuggling violation of § 1791.[7] As will be explained below, the court concludes that the latter but not the former can satisfy the "while away" requirement of § 2P1.1(b)(2).

### (a) The currency possession allegation

The court assumes that, because defendants' simple possession of unauthorized currency in their socks at the time they were searched on the prison grounds would not constitute an offense committed "while away" for purposes of § 2P1.1(b)(2), the government's position is meant to single out as the disqualifying offense defendants' (inferred) possession of the currency before they had returned to Maxwell.[8] But the government has not satisfied the "while away" requirement by singling out defendants' simple possession of the currency away from Maxwell in this manner because it has failed to show that a prisoner's mere possession of currency while away from Maxwell states an offense under § 1791.

The government's allegation that defendants committed a federal offense under § 1791 by their mere possession of money away from Maxwell depends upon the government's interpretation of § 1791 as a purely *status-based offense* (criminalizing the possession of "prohibited objects" by inmates wherever they may be) rather than a *location-based offense* (criminalizing the trafficking of contraband to and from a prison, and the possession or attempted possession of "prohibited objects" by inmates in a prison). The court is inclined to think the government's interpretation of

§ 1791 is a dubious one. To be sure, it could be said in favor of the government's interpretation that the body of § 1791(a), when isolated from the rest of the text, defines the offense in a manner that makes either a status-based or a location-based construction plausible:

> "Whoever—
>
> (1) in violation of a statute or a rule or order issued under a statute, provides to an inmate of a prison a prohibited object or attempts to do so; or
>
> (2) being an inmate of a prison, makes, possesses, or obtains, or attempts to make or obtain, a prohibited object;
>
> shall be punished as provided in subsection(b) of this section."

However, weighing against the government's position, the plain text of § 1791's title, "Providing or possessing contraband in prison," confines the offense to the prison setting. *See Carter v. United States,* 530 U.S. 255, 267, 120 S.Ct. 2159, 2168, 147 L.Ed.2d 203 (2000) (commenting that the title of a statute has interpretive value when it sheds light on ambiguous statutory language); *Pennsylvania Dept. of Corrections v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 1956, 141 L.Ed.2d 215 (1998) (accord); *Almendarez–Torres v. United States,* 523 U.S. 224, 234, 118 S.Ct. 1219, 1226, 140 L.Ed.2d 350 (1998) (stating that the title of a statute or the heading of a section may resolve doubt about the meaning of a statute, and construing a substantive criminal offense in light of its statutory title, the significant number of statements in the legislative history confirming the import of the title, and taking

---

**6.** Government's correction to its position on sentencing, filed March 12, 2001.

**7.** Government's position on sentencing, filed March 7, 2001, pp. 5, 4.

**8.** The government has never elaborated on its simple possession-based theory of a disqualifying offense.

into account the substantive unfairness of a contrary interpretation).

The contextual evidence also strongly supports the location-based construction of § 1791. Section 1791's legislative history includes many references to § 1791 offenses describing them as specific to the prison context and as offenses that will often need to be defined by delegated administrative authority as well as the statute. *See, e.g.,* S.Rep. No. 98–225, at 380 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182 (describing congressional revision of § 1791 as designed to fill a gap in the law so that mere possession of prohibited objects inside a prison, not just the smuggling of prohibited objects into or out of a prison, would be criminalized).[9] A related statute similarly provides for administrative definition of prohibited objects. *see* 18 U.S.C.A. § 4012 (authorizing Bureau of Prisons personnel to summarily seize any object introduced into a federal prison or "possessed by an inmate of such a facility *in violation of a rule, regulation or order promulgated by the Director* "). (Emphasis added).

The importance of the administrative definition of § 1791 violations is significant for choosing between the status-based and location-based definitions of the offense because the main text and title of the implementing regulation promulgated to help define § 1791 offenses assume that § 1791 offenses are specific to the prison context. *See* 28 C.F.R. § 6.1 ("The introduction or attempt to introduce into or upon the grounds of any Federal penal or correctional institution or the taking or attempt to take or send therefrom anything whatsoever without the knowledge and consent of the warden or superintendent of such Federal penal or correctional institution is prohibited.").

It could be argued that the many legislative history references to the role of administrative authority in defining § 1791 crimes, as well as the many descriptions of § 1791 crimes as ones that are confined to the federal-prison context (despite the general character of these references), might have been intended to describe only § 1791(a)(1) violations by non-inmates rather than § 1791(a)(2) violations by inmates, or to describe only § 1791 violations involving those "prohibited objects" not specifically enumerated in the statute rather than enumerated "prohibited objects" such as currency. However, other contextual evidence suggests that inmate violations of § 1791(a)(2) are always connected in some way to the prison context. Section § 2P1.2, the specific sentencing guideline indexed with § 1791, is entitled "Providing or Possessing Contraband in Prison," and includes in § 2P1.2(a)(4) a

**9.** *See also, e.g.,* H. Rep. No. 98–1030 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182 ("Both offenses [in § 1793] thus follow the format of existing 18 U.S.C. § 1791 in delegating authority to the attorney general to issue regulations enumerating or describing the kinds of objects that may be the subject of criminal sanctions under this section. With respect to weapons, currently covered in 18 U.S.C. 1792, this adds an element of proof since under that statute there is no proof required that a dangerous weapon was prohibited by any regulation. However, this added requirement should pose no practical problem because 28 C.F.R. 6.1 need only be amended to track the language and prohibitions of new section 1793 as it does now for section 1791."); *United States v. Fox,* 845 F.2d 152, 154–155 (7th Cir.1988) ("The legislative history indicates that, [while] § 1791(a) was adopted in order to cure a defect ... whereby the possession by an inmate at a Federal penal or correctional institution of a weapon or similar substance or object designed to kill, injure or disable another was not a crime," § 1791 was not intended to otherwise replace the existing statute pertaining to prison contraband which "had been interpreted to bar only the introduction into, or movement from place to place within, a prison facility of a prohibited object by an inmate.").

reference to "the institution." Additionally, this court has been unable to find any reported case in which § 1791 has been used to charge someone for an offense that lacks any connection to the location of a prison (for example, a simple-possession allegation against an escapee such as that of the government in the present case), nor any case or commentary in which a status-based rather than a location-based construction of the statute is considered or assumed. *Compare, e.g., United States v. Ponder,* 963 F.2d 1506, 1510 (11th Cir. 1992) (stating, in a factual context where there is no dispute about the location of the offense, that "Section 1791 prohibits the provision or possession of controlled substances ... *inside a federal prison facility.*") (emphasis added).

Moreover, the difficult question of whether the government's construction of § 1791 as a status-based offense deserves any credence as a general matter is made even more difficult by the more narrow or fact-specific question of whether the statute contemplates a status-based offense for currency as applied to the circumstances of the present case. For, it is doubtful that the government can state such a simple possession offense under § 1791 where the alleged "prohibited object" is currency possessed away from a prison facility but where the government has conceded that money is not prohibited to inmates in all circumstances and where the government has introduced no evidence of any administrative prohibition or other law that expressly encompasses a prisoner's possession of money away from prison.

At the sentencing hearings, the government presented no evidence that inmates are prohibited from having currency when they are off the camp. The government's witnesses stated only that Maxwell inmates are not allowed to have paper currency on their person *at the camp*, al-

though they are allowed to have unlimited amounts of money credited to their prison bank accounts and are permitted to possess coins at the camp to purchase items out of vending machines. 28 C.F.R. § 6.1, the implementing regulation for § 1791, creates a prohibition against only trafficking or attempted trafficking in unauthorized objects on or from "the grounds of any Federal penal or correctional institution." If there are other rules regulating prisoner's contact with money away from the prison camp, the government has done nothing to inform the court about them.

Given its failure to present any evidence of an administrative prohibition against simple possession of currency away from a prison, the government presumably means to argue that the statutory terms of § 1791 are alone sufficient to criminalize an inmate's simple possession of currency regardless of the inmate's location on or off the premises. After all, the statute itself provides a list of "prohibited objects" that includes not only currency but firearms, weapons, destructive devices, and controlled substances and "any other object that threatens the order, discipline, or security of a prison, or the life, health, or safety of an individual." 18 U.S.C.A. § 1791(d)(1). If the government's status-based and location-neutral construction of § 1791 were generally correct, then the statute standing alone would indeed seem to provide sufficient and express authority for the proposition that a prisoner's possession of currency is a criminal offense in all circumstances, regardless of that prisoner's location.

If, for the sake of argument, this court were to credit the status-based construction of § 1791, whether as a general matter or just in contexts involving certain "prohibited objects" (for example, firearms and controlled substances rather than sunglasses and chewing gum), this court still

could not conclude with confidence, at least as applied to defendants' case, that § 1791(d)(1)(E)'s express definition of currency as a "prohibited object" should also be viewed as creating a purely status-based criminal prohibition that extends outside the prison context. In part, this is so because the government itself has painted a messy factual picture indicating that inmates' relation to money is variably regulated depending upon the context. With this lack of clarity, the government's undisputed testimony that inmates are prohibited from direct, physical possession of paper currency on the prison camp only raises the question why the government presented no testimony indicating whether there are Bureau of Prisons regulations or even informal rules and practices about currency that are not tied to the physical location of the prison. This court is left with no basis for knowing whether, say, an inmate returning from escape status or a work assignment off the premises would commit a distinct offense by openly possessing currency that he intended to turn over to prison officers for deposit to his inmate account.

This difficulty is compounded by the fact that possession of currency off prison premises is very far from being a *malum in se* offense. Items, such as currency or unauthorized sunglasses, may be necessarily prohibited in prison because they disrupt order, safety, and discipline in the institution, yet they may be innocuous or even essential outside the prison where there is likely no institution to provide the prisoner with his basic needs. Possession and use of currency in particular is not only an ordinary part of everyday life outside a prison; it is often a necessary means for daily functioning.

In making these observations about the nature of currency, this court does not, of course, mean to question the authority of Congress (or the delegated authority of the Bureau of Prisons) to make the possession of such objects a distinct offense in the context of an escape charge. Rather, the court's point is that the legality and pervasiveness of currency in ordinary life outside prisons make it all the less clear that Congress did in fact intend in § 1791 to define mere currency possession by escapees as a distinct offense. Because this court has been unable to figure out whether there exists any prohibition against an inmate's simple possession of currency away from prison, at least on the facts presented to the court in this case, inmates certainly cannot be expected to be on notice that they have committed a distinct offense when they handle money away from prison. Thus, the court doubts that the government can carry its burden to show that defendants committed a distinct offense under § 1791 by their mere possession of currency while away from the prison.

Ultimately, however, the court need not resolve this doubt because, as explained below, the government is entitled to prevail on its other allegation of a § 1791 offense.

### (b) *The attempted smuggling allegation*

■ As stated, the court holds that the government's attempt allegations against defendants qualify as offenses that are clearly criminalized by § 1791 and that they satisfy the "while away" element of § 2P1.1(b)(2)'s disqualifying proviso. The cash that defendants had hidden in their socks was discovered during strip-searches that were conducted in a Maxwell prison-facility building at some time subsequent to their initial surrender and pat-down searches. The defendants' simple possession of this concealed money at the moment of their strip-searches cannot alone serve as the factual predicate of an offense occurring while they were "away" from Maxwell. But it is reasonable to infer

from defendants' possession of the concealed money at the time of their strip-searches that they already had the cash hidden in their socks for some time during their approach to the prison-camp, that is, while they were still "away".

Further, the fact that defendants had the money in their socks (together with the absence of evidence that they lacked pockets or other more ordinary ways of carrying money) and the fact that the inmates wanted to conceal the fact of their escape, lead the court to conclude, by a preponderance of the evidence, that innocent explanations for the money (for example, that defendants were planning to submit the money for deposit into their inmate accounts through the established channels) can be ruled out, and that defendants, during their time away from Maxwell prison camp as escapees, were attempting to smuggle the money into prison life furtively in violation of § 1791 and the prison rule that prohibits unauthorized possession of United States currency at the camp.[10] In sum, while the government's simple possession argument is dubious, the court holds that defendants did commit an attempt offense under § 1791 that satisfies the "while away" element of § 2P1.1(b)(2)'s disqualifying proviso.

### 2. The "punishable by a term of imprisonment of one year or more" requirement

Before the court can conclude that defendants' escape conduct falls within § 2P1.1(b)(2)'s disqualifying proviso, it must address defendants' further argument that their alleged violation of § 1791 would not satisfy § 2P1.1(b)(2)'s requirement that the offense be "punishable by a term of imprisonment of one year or more." The first issue that arises in answering this argument is whether the Guidelines language of "punishable by" refers only to statutorily defined imprisonment ranges or, if instead, as suggested by defense counsel, it refers (in the context of a federal offense) to the imprisonment range that results from the Sentencing Guidelines and the statute operating together.

While the term "punishable by" appears throughout the Sentencing Guidelines, the court has not found any textual evidence in the Guidelines or in caselaw to suggest that "punishable by" is a term of art uniquely associated with either the Guidelines range or the statutory range. Favoring defense counsel's argument for defining "punishable by" in terms of the maximum sentence available under the Guidelines (in conjunction with the statutory range) rather than the statute alone, is the fact that this court is legally bound by the Guidelines as well as the statute in determining the punishment range for a defendant. See 18 U.S.C.A. § 3553(b). In this court (or any federal court), defendants' conduct is simply not "punishable by" the authority of the statute without regard to the Guidelines. Unless a court has lawful grounds for departure from a specific Guidelines' range—grounds which must themselves accord "due regard" to the authority of the Guidelines, a court cannot sentence a defendant to a punishment that is within a statutory maximum but higher than the maximum according to the Guidelines. See id. On this interpretation of "punishable by," if defendants had been officially charged with an offense

---

**10.** Once a court finds that a defendant generally satisfies the terms of the § 2P1.1(b)(2) adjustment, the burden of proof is on the government to show by a preponderance of the evidence that a disqualifying offense was committed (though that disqualifying offense need not have resulted in a conviction). See *United States v. Strachan,* 968 F.2d 1161 (11th Cir.1992).

under § 1791, absent any reason to think there would be lawful grounds for departure from the Guidelines sentence for an attempt violation of § 2P1.2, defendants' § 1791 violation would only be literally "punishable by" a sentence that is within the Guidelines' range as well as the statute.

■ However, these arguments for construing "punishable by" in terms of the maximum sentence available under the Guidelines are outweighed by the fact that a determination of the maximum sentence available under the Guidelines leads to an individualized definition of "punishable by." That is, even if a particular guidelines section authorizes only a sentencing range that, for any criminal history category, is clearly below the one year necessary to trigger the § 2P1.1(b)(2) disqualifying proviso, a sentence of a year or more might still be authorized under the Guidelines in a particular case on account of the upward adjustments in Chapter 3 (for example, an adjustment for obstruction of justice) or on account of an upward departure. In addition to the administrative concern that this individualized approach might add yet one more layer of complexity to the sentencing calculations, the court believes that the wording of the phrase in § 2P1.1(b)(2), "committed any federal, state, or local *offense punishable by* " (emphasis added), suggests a *categorical* determination of the range associated with a particular *offense* rather than an individualized determination of the imprisonment range for a court's sentencing of a particular defendant. The court therefore concludes that the statutory range alone should be the relevant one for purposes of the § 2P1.1(b)(2) disqualifying proviso.

Nevertheless, the court can still sidestep a decision on this issue because, as will be explained below, defendants' violation of § 1791 is "punishable by" a range that extends up to a year under the Guidelines as well as under the statute alone.

(a) *The statutory imprisonment range for a currency-related violation of § 1791*

Section 1791 authorizes "imprisonment for not more than one year" for a completed currency violation or for an attempted currency-possession violation. 18 U.S.C.A. § 1791(a)(2), (b)(4), (d)(1)(E). In setting this one-year maximum sentence, the statute does not distinguish attempted currency violations from completed currency violations nor does it distinguish offenses involving petty amounts of cash from large-scale trafficking.[11] Although some version of this statute has been in existence since 1948, the court has been unable to find any published case in which an inmate was charged under this statute for having or attempting to have only currency in prison; the cases this court has found that included a currency violation of § 1791 also involved some other, more serious § 1791 "prohibited object" such as illegal drugs or in which the cash was part of a broader criminal scheme. *See, e.g., United States v. Greene*, 41 F.3d 383 (8th Cir.1994) (remanding for an evidentiary hearing for the sentencing of a defendant contract employee of the Bureau of Prisons who pled guilty to mail fraud as well as a § 1791 violation of smuggling United States currency into a federal prison, where the district court found that the defendant slipped cash to the inmate in prison and that the defendant accepted a $ 50,000 contribution from the inmate in

11. In the legislative history, it is stated that "The committee believes that an overhaul of existing sections 1791 and 1792 to create rational penalty distinctions is appropriate but has not undertaken this task here." S.Rep. No. 98–225 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182.

exchange for help in securing a Jewish divorce).

■ Despite this apparent rarity of prosecutions under § 1791 when the only "prohibited object" is currency (as opposed to "prohibited objects" such as drugs or firearms), the court finds that the plain language of the statute authorizes a prison sentence for currency violations that includes one year. The court also concludes that this possibility of a one-year sentence brings a currency violation of § 1791 within the best interpretation of the language of the § 2P1.1(b)(2) disqualifying proviso, "punishable by a term of imprisonment of one year or more."

■ The defendants respond that an offense is not punishable by "one year or more" if that offense cannot be punished by *more* than a year and that § 1791 falls short of this because it authorizes punishment by imprisonment for "not more than one year." Grammatically, this argument depends upon reading the phrase "punishable by one year or more" as language that establishes the set of sentencing options that must be available for a particular offense to be a disqualifying one. That is, if a sentencing judge cannot choose between a sentence of a year and a sentence of more than a year for a particular offense, the § 2P1.1(b)(2) language is not satisfied. However, defendants' interpretation would mean that an offense with a minimum sentence of greater than a year would not be disqualifying because the court's sentencing options would not include punishment by one year of prison, resulting in the anomaly that more egregious offenses would fall outside the disqualification. Believing that ambiguous grammar should be interpreted in light of such practical considerations, the court construes the language "punishable by a term of imprisonment of one year or more" to mean that disqualification results from either an offense punishable by a

year or an offense punishable by more than a year.

Defendants further argue that, by using the language "a term of imprisonment of one year or more," the Sentencing Commission intended to use the line between felonies and misdemeanors as the demarcation for a disqualifying offense, and that a currency violation of § 1791, while punishable by one year, is only a misdemeanor. For this proposition, defendants cite a number of cases construing and applying § 2P1.1(b)(2), cases which do indeed fall back on the language of "felonies" versus "misdemeanors." *See, e.g., United States v. Mendiola,* 42 F.3d 259 (5th Cir.1994); *United States v. Young,* 1993 WL 125401, 991 F.2d 806 (10th Cir.1993); *United States v. Palmer,* 1991 WL 153651, 940 F.2d 653 (4th Cir.1991). However, none of these cases involves disqualifying offenses with sentencing ranges for which the choice of the felony-versus-misdemeanor language rather than the literal language of "one year or more" would be dispositive. Thus, these cases do not engage with, and are not precedent for, the borderline question of whether a statute that authorizes imprisonment up to a year falls within the language "one year or more". Moreover, the court notes that the felony-versus-misdemeanor terminology, as well as the language "one year or more," appears in other contexts in the Guidelines—evidence that the Sentencing Commission was aware of, and could have employed, the felony-versus-misdemeanor language in § 2P1.1(b)(2) if that is what it intended. *Compare, e.g.,* U.S.S.G. § 4A1.2(*o*) ("felony") with U.S.S.G. § 2J1.6 ("punishable by a term of imprisonment of one year or more"). Thus, while a currency violation of § 1791 authorizes a punishment that is only marginally within the set of crimes "punishable by a term of imprisonment of one year or more," and while criminal prosecutions for this offense are apparently rare, defendants cannot escape the fact

that their attempted currency-smuggling is nonetheless statutorily punishable by a sentence that falls within the precise numerical range established for the § 2P1.1(b)(2) disqualifying proviso.[12]

(b) *The Guidelines imprisonment range for an attempt violation of § 1791*

█ As stated, the court concludes that the statutory imprisonment range alone is the appropriate reference point for purposes of the term "punishable by" in § 2P1.1(b)(2). Nevertheless, so as to address all of defendants' argument, the court further finds that, if the Guidelines imprisonment range alone were the appropriate reference point, the court would reach the same conclusion that the § 2P1.1(b)(2) disqualifying proviso is met.

To be sure, if this court were writing on a clean slate, it would find, pursuant to § 2P1.2 and U.S.S.G. § 2X1.1 ("Attempt, Solicitation, or Conspiracy (Not Covered by a Specific Offense Guideline)"), that the Guidelines' imprisonment range for defendants' attempt violation of § 1791 is zero

to six months, regardless of their criminal history category but assuming no offense-level upward adjustments from other chapters apply. This range would clearly put defendants' attempted currency-smuggling outside the terms "punishable by a term of imprisonment of one year or more," thus not triggering the § 2P1.1(b)(2) disqualifying proviso. However, the court believes that the reasoning, if not the precise holding, of an Eleventh Circuit case, *United States v. Thomas*, 8 F.3d 1552 (11th Cir. 1993), precludes this result.

Whether defendants' attempted currency-smuggling violation of § 1791 could be punishable by an imprisonment range up to six months, or up to one year, depends upon whether § 2X1.1(b)(1) applies. For an attempt offense, § 2X1.1(b)(1) prescribes a three-level downward adjustment from the base-offense level attached to the associated substantive offense (that is, in defendants' case, the base-offense level set by § 2P1.2) so long as the offense is an attempt that is not expressly covered as an attempt by another offense guideline.[13]

---

**12.** At various times in this case, the government has also argued that Whitfield violated § 1791 by his possession of four pairs of sunglasses, a wristwatch, and a lighter. However, any such violations of § 1791 would be irrelevant for purposes of § 2P1.1(b)(2) because, even under the statute, "prohibited objects" that are not specifically enumerated must fall within the category "any other object that threatens the order, discipline, or security of a prison, or the life, health, or safety of an individual," and offenses involving these objects are punishable by imprisonment up to only six months. *See* 18 U.S.C.A. § 1791(b)(5) and (d)(1)(F). At one of the hearings, the government also claimed that Whitfield's possession of four pairs of sunglasses constituted a currency violation of § 1791 because they are obviously "items for resale." However, the statutory term "currency" cannot be stretched so far. As a general matter, if currency were defined as items that are salable, almost any object (every object, according to many economists) would qualify as currency. And, as a factual

matter in this case, the government has provided no evidence with which the court could exclude the possibility that the sunglasses were intended as gifts or for personal use.

**13.** Section 2X1.1(b)(1) says that "If an attempt, decrease [the base-offense level of the substantive offense] by 3 levels, unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control." The question of whether defendants' attempted currency smuggling would fall within the "unless" proviso would not be a close question here since, for purposes of § 2P1.1(b)(2)'s "while away" clause, their conduct has to be defined as an offense at some moment in time before the prisoners reached Maxwell prison camp, that is, at some time when there is no question that the attempted smuggling was not complete.

*See* U.S.S.G. § 2X1.1 generally and § 2X1.1(c)(1). Without the § 2X1.1(b)(1) adjustment, however, defendants' imprisonment range under § 2P1.2 reaches up to one year, thus triggering the § 2P1.1(b)(2) disqualifying proviso for offenses punishable by a year or more. In deciding whether defendants' attempted smuggling is punishable under the Guidelines by a year, it is crucial then to understand what it means for an attempt offense to be expressly covered by another offense guideline.

In *United States v. Thomas,* the Eleventh Circuit, with little discussion, construed the application of § 2X1.1 to conspiracy rather than to attempt. Nonetheless, the reasoning relied upon in *Thomas* is apt because the language of the specific-offense characteristic in § 2X1.1(b)(2) for conspiracy is substantially the same as that of § 2X1.1(b)(1), the specific-offense characteristic for attempt, and because *Thomas* construes § 2X1.1(c)(1), the "cross reference" that defines when an attempt, solicitation, or conspiracy does not get the benefit of a reduction under § 2X1.1. The *Thomas* court determined that § 2X1.1(c)(1) ("When an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section, apply that guideline section [rather than the three-level downward adjustment]") does not mean that the text of another *guideline* needs to refer expressly to an incomplete offense for the § 2X1.1 adjustments not to apply. Instead, according to *Thomas,* "where the *statutory* section defining the offense of conviction prohibits conspiracy, and that section is expressly covered by a particular guideline, the offense level provided by that guideline is controlling, and § 2X1.1 does not apply." 8 F.3d at 1564 (emphasis added).

Applying the transitive reasoning of *Thomas* to defendants' case, § 2P1.2 is a separate guideline that expressly covers attempt offenses like defendants' because it is expressly indexed with § 1791, and because the underlying statutory text of § 1791 specifically includes the word "attempt". Thus, on the *Thomas* reasoning, § 2X1.1(c)(1) kicks in, preventing application of the § 2X1.1(b)(2) three-level downward adjustment and giving defendants' offense an imprisonment range that includes a year.

This court, however, doubts that the *Thomas* construction of § 2X1.1(c)(1) can be reconciled with the language and overall incomplete-offense scheme of the Guidelines. The Guidelines offer several relevant sources of guidance about when this adjustment for an attempt offense should be made—all of which together seem much more consistent with a rule stating that the language of a specific guideline section, not just that of an underlying statute associated with a guideline, must refer to an inchoate offense. First, the title of § 2X1.1 is named "Attempt, Solicitation, or Conspiracy (Not Covered by a Specific Offense *Guideline* )." (Emphasis added). Second, § 2X1.1(c)(1) says that "When an attempt, solicitation, or conspiracy is *expressly* covered by another *offense guideline section,* apply that guideline section." (Emphasis added).

Third, Application Note 1 to § 2X1.1 gives a list of "offense guidelines that expressly cover attempts" (that is, offenses that would be excluded from the § 2X1.1(b)(1) three-level adjustment). This list names 27 guideline sections. Unlike the guideline section associated with § 1791, *all* 27 of these sections have language expressly describing inchoate offenses in their titles, and 23 of the 27 titles actually use the word "attempt." The word "attempt" is used in the titles of

U.S.S.G. §§ 2A2.1, 2A3.1, 2A3.2, 2A3.3, 2A3.4, 2A5.1, 2D1.1, 2D1.2, 2D1.5, 2D1.6. 2D1.7, 2D1.8, 2D1.9, 2D1.10, 2D1.11, 2D1.12, 2D1.13, 2D2.1, 2D2.2, 2D3.1, 2D3.2, 2E5.1, 2N1.1, 2Q1.4. The four of the 27 without the word "attempt" in their titles have other inchoate language in their titles: U.S.S.G. § 2A4.2 (*"Demanding* or Receiving Ransom Money"); § 2C1.1 (*"Offering,* Giving, *Soliciting,* or Receiving a Bribe; Extortion Under Color of Official Right"); § 2C1.2 (*"Offering,* Giving, *Soliciting,* or Receiving a Gratuity"); and § 2E5.1 (*"Offering,* Accepting, or *Soliciting* a Bribe or Gratuity . . ."). (Emphasis added). Even if this list of 27 is merely illustrative rather than exhaustive, it is telling that none of these listed sections resembles a situation, such as in the present case, where only the underlying statute not the guideline language itself refers to attempts.

Fourth, U.S.S.G. § 1B1.2 instructs courts to

"Refer to the Statutory Index (Appendix A) to determine the Chapter Two offense guideline, referenced in the Statutory Index for the offense of conviction. If the offense involved a conspiracy, attempt, or solicitation, refer to § 2X1.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense."

Thus, this framework seems to envision that the § 2X1.1 incomplete-offense guideline section is incorporated into the Statutory Index system by § 1B1.2. *Thomas* centrally relied upon the indexing of a statute with a particular guideline section but that case did not consider the effect of § 1B1.2.

█ Fifth, and most problematic for the *Thomas* construction, the § 2X1.1(c) cross reference (instructing that "When an attempt, solicitation, or conspiracy is expressly covered by another offense guide-line section, apply that guideline section") will rarely, if ever, *not* apply to an attempt, solicitation, or conspiracy; that is, the cross-reference swallows the rule, and the three-level adjustment of § 2X1.1 will, at most, apply in rare instances. This is so because a federal attempt offense cannot be criminalized absent some statutory authority specifically covering the inchoate offense not just the completed offense, *see, e.g., United States v. Hudson and Goodwin,* 11 U.S. 32, 7 Cranch 32, 3 L.Ed. 259 (1812). Thus, sentencing for an inchoate federal offense always requires an underlying statute that itself expressly covers the inchoate offense.

Under *Thomas,* the only time the § 2X1.1 three-level adjustment might apply (other than when another guideline specifically invokes the adjustment) is if the court is sentencing an attempt offense under a particular guideline even though the relevant statute is not indexed to any specific guideline. Even if many such situations exist, this construction has the very arbitrary consequence that, as a general matter, the three-level adjustment applies to only statutory offenses not contemplated in the statutory index. That is, on this schema, the three-level adjustment is not even used to differentiate attempts as lesser crimes than completed offenses; instead, it only differentiates among attempt offenses depending upon whether they got left out of the Guidelines' statutory index—a distinction that does not seem to track any relevant sentencing consideration.

Finally, the instruction in § 1B1.2 becomes nearly incoherent under *Thomas* because the § 2X1.1 adjustments will never generally apply (for example, the cross-reference will always govern) when statutes are indexed to a particular guideline yet § 1B1.2 specifically directs that, after determining the specific guideline indexed

to a particular statute, one should then refer to § 2X1.1 for attempt, solicitation or conspiracy offenses.

Moreover, there are more than just textual problems with *Thomas.* The Eleventh Circuit based its construction of § 2X1.1 on the reasoning of a Second Circuit case, *United States v. Skowronski,* 968 F.2d 242 (2d Cir.1992), rather than on any independent analysis. However, the Second Circuit has now stated that *Skowronski* was at least wrongly reasoned. *See United States v. Amato,* 46 F.3d 1255 (2d Cir. 1995) (application of the § 2X1.1 three-level adjustment turns upon whether the conspiracy is expressly covered by another guideline section not on the content of the relevant criminal statute); *United States v. Goldberg,* 1997 WL 218784, 113 F.3d 1230 (2d Cir.1997) (unpublished) (questioning whether *Skowronski* has any continuing significance and commenting that the § 2X1.1(c)(1) cross reference is triggered only by inchoate language in a specific guideline section not by the presence of such language in an underlying statute); *see also Scibetta v. United States,* 32 F.Supp.2d 711 (D.N.J.1998) (calling the *Amato* opinion a "contrived" effort to fix the problem created by the misinterpretation of § 2X1.1 in *Skowronski,* and commenting that the Second Circuit since *Amato* has clearly abandoned the "offense language theory").

Nonetheless, this court finds that *Thomas* is still precedent in the Eleventh Circuit and that the parallel between the § 2X1.1(b)(1) specific-offense characteristic for attempt and the § 2X1.1(b)(2) specific-offense characteristic for conspiracy construed by *Thomas* is too exact for the court to ignore. It is true that another Eleventh Circuit case, *United States v. Khawaja,* 118 F.3d 1454 (11th Cir.1997), without observing the existence of the *Thomas* precedent, does not follow the *Thomas* approach to the § 2X1.1 adjust-ments but instead treats the language of the specific guideline rather than that of the underlying statute as dispositive. However, the *Khawaja* analysis is merely dicta because that panel based its holding on grounds other than its § 2X1.1 analysis. Only the earlier *Thomas* opinion is precedent for this court. Thus, without further Eleventh Circuit or Supreme Court clarification of the cross reference in § 2X1.1(c)(1), the court is compelled to fall back on the *Thomas* logic; that is, if the relevant underlying statute contains attempt language (as does § 1791), then the three-level downward adjustment of § 2X1.1(b)(2) does not apply. Ultimately, then, it makes no difference for defendants whether the "punishable by" language of § 2P1.1(b)(2) refers to the Guidelines' range or only to the underlying statutory range because, in light of *Thomas,* the inmates' § 1791 violations are punishable by a year under either or both the statute and the Guidelines.

## III. § 5K2.0 DOWNWARD DEPARTURE

As an alternative to their argument that the § 2P1.1(b)(2) seven-level downward adjustment applies to their escape conduct, defendants have moved for a downward departure. In *Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), the Supreme Court articulated with broad strokes the approach courts should use in determining whether a departure is warranted under U.S.S.G. § 5K2.0 ("Grounds for Departure (Policy Statement"), and ch. 5, pts. H & K (providing lists of forbidden, discouraged and encouraged grounds for departure)). *See also Buford v. United States,* —— U.S. ——, 121 S.Ct. 1276, 149 L.Ed.2d 197 (2001) (describing the role of district courts in making factual findings and applying the Sentencing Guidelines to the facts).

The Eleventh Circuit provided a useful summary of the *Koon* approach in *United States v. Hoffer*, 129 F.3d 1196 (11th Cir. 1997). The *Hoffer* court explained that, "To determine whether a factor which takes a case outside the heartland [that is, outside the range of typical cases contemplated by the Guidelines] should result in a different sentence, a district court must first decide whether the factor is forbidden, encouraged, discouraged, or unaddressed by the guidelines as a potential basis for departure. If a factor is forbidden, *see, e.g.,* U.S.S.G. § 5H1.0 (race, sex, national origin, creed, religion and socioeconomic status), a district court cannot use it to depart from the applicable guideline." 129 F.3d at 1200 (internal citations omitted). "If a factor is encouraged, *see, e.g.,* § 5K2.1 (causing death), a court is authorized to depart from the applicable guideline if the guideline does not already take that factor into account. If a factor is discouraged, *see, e.g.,* § 5H1.2 (education and vocational skills), or is an encouraged factor already taken into account by the applicable guideline, a district court may depart only if the factor is present to an exceptional degree or in some other way makes the case distinguishable from an ordinary case where the factor is present." *Id.; see also* 18 U.S.C.A. § 3553(b).

The *Hoffer* court then concluded that a district court may depart on the basis of a factor not addressed by the Sentencing Commission as a basis for departure, "if it finds, after considering the structure and theory of both the relevant individual guidelines and the Guidelines taken as a whole, that the factor takes the case out of the applicable guideline's heartland. However, a district court departing on the basis of an unenumerated factor should bear in mind the Commission's expectation that such departures will be highly infrequent." 129 F.3d at 1201.

Here, the special circumstances presented are neither "forbidden," "encouraged," nor "discouraged" as a basis for departure in the lists provided in Chapter 5, Parts H and K. However, while defendants' circumstances are "unaddressed" in these lists, they are not unaddressed as a basis for sentencing by the Guidelines more generally. The specific guideline section governing sentencing in this case, § 2P1.1(b)(1), obviously addresses when an adjustment of the base-offense level for escape should be made, taking into account "the prisoner's voluntary return, the security level of the prison, and the amount of time the escapee remains at large" as well as the escapee's commission of a disqualifying offense. *United States v. Weaver,* 920 F.2d 1570, 1572, 1574. (11th Cir.1991).

■ The Guidelines are clear, however, that the fact that a circumstance has already been considered by the Sentencing Commission as a basis for sentencing does not mean that it cannot still serve as a basis for departure. First, § 5K2.0 provides that "the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' ... [T]he court may depart from the guidelines, even though the reason for departure is taken into consideration in determining the guideline range (*e.g.,* as a specific offense characteristic or other adjustment), if the court determines that, in light of unusual circumstances, the weight attached to that factor under the guidelines is inadequate or excessive." (Citing 18 U.S.C.A. § 3553(b)); *see also Koon,* 518 U.S. at 92, 116 S.Ct. at 2044 ("we learn [from the Guidelines Manual]

that the Commission did not adequately take into account cases that are, for one reason or another, 'unusual.' ").

Second, in U.S.S.G. Ch. 1 Pt. A, intro. (4(b)), a departure based on a factor that is reflected in a specific guideline but one that is not listed in Chapter 5, Part K is described as a "guided departure":

> "It is important to note that the guidelines refer to two different kinds of departure. The first involves instances in which the guidelines provide specific guidance for departure by analogy or by other numerical or non-numerical suggestions. The Commission intends such suggestions as policy guidance for the courts."

The Eleventh Circuit has interpreted this notion of a "guided departure" to be one that encompasses departures based upon considerations already accounted for in a specific guideline section when those considerations have not been accounted for to a degree that is adequate in particular circumstances. The court specifically offered this interpretation of a "guided departure" in the § 2P1.1(b)(2) context. *See Weaver,* 920 F.2d at 1574.

In *United States v. Weaver,* the Eleventh Circuit established in the context of escape convictions that, under certain circumstances, prisoners may fail to satisfy all of the literal requirements of the § 2P1.1(b)(2) adjustment yet nonetheless warrant a comparable downward departure based on factors already embodied in the guideline section. *See* 920 F.2d 1570 (11th Cir.1991). In *Weaver,* although the escapee's return to prison after three months was too late to warrant a § 5K1.0 departure, the Eleventh Circuit still made clear that, "[g]iven the magnitude of the reduction available under ... § 2P1.1(b)(2), [it did] not think the Commission intended to erect an impenetrable barrier at 96 hours; that is, an escapee who returns after 97 hours could receive

the benefit of some reduction under this guideline section". *See also United States v. Birchfield,* 709 F.Supp. 1064 (M.D.Ala. 1989) (Thompson, J.).

Similarly here, given the magnitude of the reduction available under § 2P1.1(b)(2), the court does not think the Sentencing Commission intended to erect an impenetrable barrier against an escapee's receipt of the benefit of some reduction of the base-offense level to account for his voluntary return even though that escapee committed a disqualifying offense. The court finds that defendants' escape conduct does not fall within the range of typical cases sentenced under § 2P1.1(b)(2) because defendants' disqualification from the adjustment costs them a full seven levels in their offense level yet their currency violation of § 1791 fits within the terms of the disqualifying proviso by the most marginal of margins.

First, a violation of § 1791 is punishable by one year at most while § 2P1.1(b)(2)'s disqualifying proviso only begins to attach at one year; they overlap by only one day, with the reach of § 2P1.1(b)(2) being in the direction of less than one year and the reach of § 1791 being in the opposite direction of one year and upwards. It is thus apparent that the thrusts and directions of the two provisions are opposite. Second, this atypicality is compounded by the fact that the penalty scheme of § 1791 does not distinguish between attempts and completed offenses, or between petty-cash infractions (as is true here) and large-scale currency trafficking, and, as discussed earlier, by the dearth of published cases involving currency-only prosecutions under § 1791.

The court does not think that, when the Sentencing Commission created the disqualifying proviso in § 2P1.1(b)(2), it contemplated that inmates who commit a distinct offense of the degree of limited

severity of defendants' cash-in-their-socks would be sentenced within the same range as defendants who escaped high-security facilities with an intent to permanently evade serving the remainder of their sentence and who were returned to confinement involuntarily. Therefore, "[g]iven the magnitude of the reduction available under U.S.S.G. § 2P1.1(b)(2)," *Weaver*, 920 F.2d at 1574, the court believes that a downward departure by analogy to § 2P1.1(b)(2) is appropriate.

The court, however, does not think that defendants are so similarly situated to escapees whose conduct meets all the § 2P1.1(b)(2) qualifications—that is, escapees who did not commit a disqualifying offense—that they deserve a downward departure to the same sentencing range they would have had if they had not committed a distinct offense and had received the adjustment. But for the fact that their attempt to sneak cash into Maxwell prison camp triggered the disqualifying proviso, defendants' escape conduct fits all of the requirements to merit the § 2P1.1(b)(2) seven-level downward adjustment; but, as is apparent from the disqualifying proviso, this is an important "but for." By concealing between $ 70 and $ 80 in their socks, defendants knowingly attempted to violate the rules about inmate possession of currency in prison. This attempted smuggling conduct, despite the modest sums of money involved, makes defendants' escape conduct more culpable than that of equivalent escapees who have not committed distinct offenses. Further, the court finds that defendants' conduct demands some measure of extra deterrence to outweigh any extra escape incentives that might be created by the perception that short escapes include the opportunity to bring cash back to Maxwell prison camp. Thus, this court declines to give defendants a downward departure equivalent to the seven-level adjustment they would have received

if they had returned to Maxwell without the money in their socks.

In conclusion, the court does not intend to use its own judgment to precisely individualize and calibrate every defendant's sentencing range when the relevant factors have already been considered by the Commission. However, defendants' disqualification from the § 2P1.1(b)(2) adjustment is truly of the exceptional variety that brings the case outside the "heartland, [the] set of typical cases embodying the conduct that each guideline describes," *Birchfield*, 709 F.Supp. at 1066. Based upon the policy concerns embodied in both the § 2P1.1(b)(2) adjustment and disqualifying proviso, as applied to the particular facts of this case, the court concludes that the interests of just punishment and deterrence are best served by giving defendants each a partial downward departure by analogy to § 2P1.1(b)(2) of three levels.

Defendants will be sentenced in accordance with this opinion.